IN RE COMPLAINT OF CITY OF REYNOLDSBURG, APPELLANT; COLUMBUS SOUTHERN POWER COMPANY, INTERVENING APPELLEE; PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *In re Complaint of Reynoldsburg,*

134 Ohio St.3d 29, 2012-Ohio-5270.]

*Public utilities—Municipal home rule—Ohio Constitution, Article XVIII, Section 3—Electric company's tariff prevails over ordinance requiring company to pay costs of relocating electric lines underground.*

(No. 2011-1274—Submitted September 12, 2012—Decided November 15, 2012.)

APPEAL from the Public Utilities Commission of Ohio, No. 08-0846-EL-CSS.

_____

O'DONNELL, J.

## SUMMARY

{¶ 1} The city of Reynoldsburg is a municipal corporation governed by a charter. Intervening appellee, Columbus Southern Power Company ("CSP"), is a public utility under R.C. 4905.02 and provides electric power to Reynoldsburg and its residents.

{¶ 2} The issue in this case is whether Reynoldsburg or CSP bears the cost to relocate overhead power lines underground. Specifically, Reynoldsburg seeks a ruling that its right-of-way ordinance requiring all overhead power lines to be relocated underground takes precedence over CSP's commission-approved tariff in this particular aspect. Reynoldsburg City Code 907.06(A)(4) requires any public utility to relocate its facilities located within the city's public rights of way underground at the "sole cost" of the public utility if the city's public-service director determines that the relocation is reasonable and part of a local improvement project. In contrast, Section 17 of CSP's tariff provides that

municipalities shall pay the costs whenever they require CSP to relocate overhead electrical distribution lines underground.

{¶ 3} Reynoldsburg filed a complaint with the Public Utilities Commission ("PUCO") pursuant to R.C. 4905.26, contending that its ordinance superseded CSP's tariff and that the tariff was unjust, unreasonable, and unlawful. The commission found in favor of CSP.

{¶ 4} Reynoldsburg appealed that decision to this court, raising six propositions of law. After review, we affirm the commission's orders.

### BACKGROUND

{¶ 5} In 1992, the commission approved a tariff as part of CSP's last general rate case. Section 17 of CSP's tariff provides that municipalities and other public authorities must pay the cost of requiring CSP to relocate overhead electric distribution lines underground. *See In re Application of Columbus S. Power Co. for Authority to Amend Its Filed Tariffs to Increase Rates & Charges for Elec. Serv.*, Pub. Util. Comm. No. 91-418-EL-AIR, 1992 WL 205335 (May 12, 1992).

{¶ 6} On April 24, 2000, the Reynoldsburg City Council passed an ordinance granting a five-year nonexclusive franchise to CSP to construct, maintain, and operate lines for distribution and transmission of electricity in, over, under, and through the streets, avenues, alleys, and public places of the city. The franchise agreement expired on April 24, 2005, but CSP continued to operate its facilities in the city's rights of way.

{¶ 7} In the early 2000s, Reynoldsburg began a comprehensive project to revitalize its commercial corridors. The project was known as the Reynoldsburg Major Commercial Corridors Revitalization Project or "Main Street Project." The city's project plans included the building of an underground utility duct and the

2

relocation of overhead utility lines into the underground duct. The first phase of the Main Street Project began in 2003. Phase II of the project began in 2005.

{¶ 8} In October 2004, the city applied for a community-development grant from Franklin County in conjunction with Phase II of the project. The application represented that the existing overhead electric lines in the right of way would be removed and placed underground.

{¶ 9} On May 9, 2005, two weeks after the expiration of CSP's right-of-way franchise, the Reynoldsburg City Council passed an ordinance "To Enact a Comprehensive Right of Way Management Policy." Reynoldsburg City Code 907.06(A)(4), enacted by the ordinance, authorized the city's public-service director to designate portions of the city's right of way as being suitable for underground utility facilities and to require any utility that had facilities located within the city's public rights of way to relocate those facilities underground at the utility's "sole cost." Reynoldsburg City Code, Section 907.06(A)(4).

{¶ 10} On July 8, 2005, Reynoldsburg Public Service Director Sharon L. Reichard notified CSP by letter that the city intended to begin construction of Phase II of the Main Street Project. Reichard, citing her authority under the right-of-way ordinance, ordered CSP to relocate its "facilities within the public right of way of the Project into the underground duct bank." According to that letter, the city designated that the portion of the public right of way within the construction project would "accommodate only utility facilities located underground." Relying on its approved tariff, CSP refused to pay the relocation costs and informed Reynoldsburg that the city bore responsibility for the cost of burying the overhead lines.

{¶ 11} On November 1, 2005, Reynoldsburg entered into a letter agreement with CSP in order not to delay the Main Street Project. Pursuant to the agreement, Reynoldsburg agreed to conditionally pay the estimated cost for CSP to move the lines underground—in an amount not to exceed $1,185,535—and

CSP agreed to relocate its facilities. The parties further agreed that the dispute over the ultimate liability for the costs would be resolved in an appropriate forum.

{¶ 12} In July 2006, Reynoldsburg filed a complaint for a declaratory judgment in the Franklin County Court of Common Pleas. Case No. 06-CVH-07-8792. Reynoldsburg sought a declaration that CSP had a legal obligation to relocate its overhead lines at its sole cost and that Reynoldsburg was entitled to reimbursement of its costs in accordance with the parties' agreement. CSP moved to dismiss for lack of subject-matter jurisdiction, contending that the Public Utilities Commission had exclusive jurisdiction over the matter. The trial court denied CSP's motion. *See State ex rel. Columbus S. Power Co. v. Fais*, 117 Ohio St.3d 340, 2008-Ohio-849, 884 N.E.2d 1, ¶ 11-12.

{¶ 13} CSP then sought a writ of prohibition in this court to prevent the trial court from proceeding on the declaratory-judgment action. We granted a writ of prohibition, finding that the common pleas court lacked jurisdiction and that the commission had exclusive, original jurisdiction over the matter.

{¶ 14} In July 2008, Reynoldsburg filed a complaint with the commission pursuant to R.C. 4905.26, alleging that CSP's tariff was unjust, unreasonable, discriminatory, and/or unlawful. Specifically, the city alleged that (1) the tariff did not apply to Reynoldsburg, (2) the city's right-of-way ordinance superseded the tariff, and (3) the tariff violated the Ohio Constitution, Article XVIII, Sections 3 and 4.

{¶ 15} On April 5, 2011, the commission issued its order denying Reynoldsburg's complaint. The commission found that (1) CSP's tariff applied to Reynoldsburg under the facts of the case, (2) under the tariff, the city is responsible for the entire cost of relocating the electric lines, and (3) the tariff is just and reasonable in that it helps to ensure that CSP and its ratepayers do not incur the expense of relocating facilities underground upon the request of a municipality and is consistent with the principle that the cost-causer be the cost-

payer. The commission did not render any ruling with respect to Reynoldsburg's constitutional claims.

{¶ 16} Reynoldsburg timely filed an application for rehearing, which the commission denied.

{¶ 17} Reynoldsburg now appeals to this court.

### STANDARD OF REVIEW

{¶ 18} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a PUCO decision as to questions of fact if the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id*.

{¶ 19} Although this court has "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

## DISCUSSION

{¶ 20} Reynoldsburg challenges CSP's tariff on the grounds that it is unjust, unreasonable, and unlawful. Section 17 of the tariff provides that if a municipality requires overhead distribution lines to be relocated underground, the municipality is required to pay CSP's costs to bury the lines. Reynoldsburg contends that this cost provision usurps the city's authority to regulate its public right of way, because it believes that its right-of-way ordinance—which requires the utility to pay the cost to move overhead electric lines underground—controls over the cost provision of the tariff.

### Home Rule

{¶ 21} The Ohio Constitution, Article XVIII, Section 3, commonly known as the Home Rule Amendment, authorizes municipalities "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." In *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted*, 65 Ohio St.3d 242, 244, 602 N.E.2d 1147 (1992), we explained that the words "as are not in conflict with general laws" modify the words "local police, sanitary and other similar regulations" but do not modify the words "powers of local self-government."

{¶ 22} Reynoldsburg claims that CSP's tariff violates the Home Rule Amendment because it infringes on the city's "powers of local self-government," as opposed to its police powers, and it urges that municipal powers of local self-government include the power to regulate the public ways. Reynoldsburg further asserts that its right-of-way ordinance relates solely to matters of local self-government because it regulates only the use and occupancy of the public ways, and it contends that CSP's tariff therefore cannot prevail over its ordinance because "only regulations enacted under a municipality's police power can be scrutinized for conflicting with 'general law.'"

{¶ 23} Alternatively, Reynoldsburg argues that the right-of-way ordinance should prevail over the tariff because it is a valid exercise of the city's local police powers.

{¶ 24} This court has applied a three-step process for home-rule analysis. The first step is to determine whether the ordinance involves an exercise of local self-government or an exercise of local police power. If the ordinance relates solely to self-government, the analysis ends because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction. The second step, which becomes necessary only if the local ordinance is an exercise of the police power, requires a review of the state statute to determine whether it is a general law under the court's four-part test announced in *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus. If the statute qualifies as a general law under this test, the final step is undertaken to determine if the ordinance is in conflict with the statute. *Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 23-24; *Marich v. Bob Bennett Constr. Co.*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, ¶ 9, 16.

*Local Self-Government or Local Police Power*

{¶ 25} "An ordinance created under the power of local self-government must relate 'solely to the government and administration of the internal affairs of the municipality.' " *Id.* at ¶ 11, quoting *Beachwood v. Cuyahoga Cty. Bd. of Elections*, 167 Ohio St. 369, 148 N.E.2d 921 (1958), paragraph one of the syllabus. Conversely, "the police power allows municipalities to enact regulations only to protect the public health, safety, or morals, or general welfare of the public." *Id.*, citing *Downing v. Cook*, 69 Ohio St.2d 149, 150, 431 N.E.2d 995 (1982).

{¶ 26} Reynoldsburg's right-of-way ordinance is set forth in Chapter 907 of the Reynoldsburg City Code. Section 907.06(A)(4) gives the city's public-

service director discretion to order utilities—solely at their expense—to "remove" or "rearrange" utility facilities located in the right of way. As part of the director's determination to remove or rearrange facilities and "to the extent permitted by Ohio law," the director also has the authority—again, solely at the expense of the utility—to determine that "designated portions of its Rights-of-Way should accommodate only underground facilities * * *, provided that such determination is reasonable and a part of an overall improvement or beautification plan or project."

{¶ 27} Reynoldsburg asserts that its ordinance relates solely to matters of local self-government because "[by] its terms," it regulates the use and occupancy of the city's public ways and "[n]early one hundred years of Ohio case law holds that municipal regulation of public ways is a power of local self-government." It argues that because the ordinance regulates only the public right of way—a matter of local self-government—the home-rule analysis ends because CSP's tariff cannot infringe upon the city's powers of local self-government. However, the premise of its argument is not supported in this record.

{¶ 28} Reynoldsburg claims that the terms of the ordinance support its contention that the ordinance relates solely to matters of local self-government. Yet it failed to develop its contention beyond its assertion. We therefore reject this argument. *See*, *e.g.*, *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 14 (failure to "cite a single legal authority" or "present an argument that a legal authority applies on these facts and was violated * * * alone is grounds to reject [a] claim"); *Utility Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 39 ("unsupported legal conclusions" do not establish error).

{¶ 29} Moreover, the language of the ordinance undercuts the city's claim. The preamble of the ordinance states that "it is necessary to comprehensively regulate access to, and structures and facilities in, the Rights-of-Way." But other

portions of the preamble show that the city's intent in regulating the right of way, at least in part, was to promote "the public health, safety and welfare"—words more commonly associated with an exercise of the police power. *See Downing*, 69 Ohio St.2d at 150, 431 N.E.2d 995 (police powers are those that have a real and substantial relation to the public health, safety, morals, or general welfare); *Froelich v. Cleveland*, 99 Ohio St. 376, 386, 124 N.E. 212 (1919) (police powers are those that concern "peace, health, morals and safety"). Furthermore, the ordinance also reflects that the city's purpose in passing it was to regulate vehicular and pedestrian traffic for the protection of pedestrians and drivers. *See* section 3 of the ordinance ("this ordinance is deemed to be an emergency for the immediate preservation of the public peace, health and safety in that control of the public right of way that is traversed by pedestrian and vehicular traffic * * * requires control and regulation to maintain the public peace, health and safety"). And as we held in *Marich*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, at ¶ 14, "[i]t is now clear that the regulation of traffic is an exercise of police power that relates to public health and safety as well as the general welfare of the public."

{¶ 30} In addition, evidence offered by the city supports the conclusion that the ordinance was enacted as an exercise of the police power, and not of local self-government. Robert McPherson, who served as Reynoldsburg's mayor during the Main Street Project, testified about the project.

{¶ 31} First, he identified "public safety" as "one of the primary reasons [the city] undertook the revitalization project in the first place." Second, he related numerous problems the city had experienced before the enactment of the right-of-way ordinance, including "[tr]affic congestion, parking availability, speed of traffic along the major arteries, lack of sidewalks or decrepit sidewalks, [and] * * * lack of design standards for commercial arteries." According to McPherson, the city viewed these problems as a "serious safety concern" because of "potential

injuries to motorists," as well as an "increasing safety hazard to pedestrians on Main Street." Third, his testimony reflects that officials believed that these safety hazards were caused by the "proliferation of overhead utility lines, wires, and signage [that] was a distraction to drivers along Main Street." In his view, "putting the utility lines underground had the effect of removing a lot of that distraction so drivers could focus on the road," which "made the Right of Way safer for pedestrians as well." And finally, he stated that the "safety of the Right of Way for the traveling public, which would include aesthetics insofar as all the visual clutter could also be a distraction to motorists, was a paramount concern" in requiring that the power lines be relocated underground.

*Billings, Froelich, Perrysburg,* and *Vernon*

**{¶ 32}** The city cites four cases for the general proposition that "municipal regulation of public ways is a power of local self-government." One of the cases, *Froelich v. Cleveland*, 99 Ohio St. 376, 124 N.E. 212, was questioned in *Marich*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, ¶ 13-14 (noting that the court was divided in *Froelich* and did not clearly define the municipal police power). And *Vernon v. Warner Amex Cable Communications*, 25 Ohio St.3d 117, 495 N.E.2d 374 (1986),[1] actually stands for the proposition that regulation of a cable television company's distribution network is an exercise of the municipality's local police power, not its power of local self-government. The passage from *Vernon* quoted in the brief filed by Reynoldsburg is incomplete. The quote should read: "The foregoing precedents leave no doubt that the regulation of the use of publicly owned or controlled property is an inherent exercise of a municipality's powers of local self-government, *which necessarily include the municipality's police powers*." (Emphasis added.) *Id.* at 120. The

---

1. Warner Cable was not a "public utility" under any statutory definition. The city's ordinance designated Warner as a "public utility," and this court upheld that action as a valid exercise of the home-rule and local police powers. *Id*. at 121.

city omitted the italicized language. With this language included, the import of the statement in *Vernon* is clear: municipal regulation of the public ways can be an exercise of local self-government or an exercise of the local police power. *Vernon* undermines Reynoldsburg's claim that municipal regulation of public ways is solely an exercise of local self-government.

**{¶ 33}** As to the remaining cases, *Billings v. Cleveland Ry. Co.*, 92 Ohio St. 478, 111 N.E. 155 (1915), and *Perrysburg v. Ridgway*, 108 Ohio St. 245, 140 N.E. 595 (1923), it is unclear how they advance the city's position. Neither CSP nor the commission disputes that Reynoldsburg has the authority to regulate its rights of way, including the authority to order CSP to relocate overhead power lines in the right of way underground. The dispute here is over whether the city can impose on CSP the costs of burying the overhead lines. The facts of this case bear this out. During Phase I of the Main Street Project and before the city enacted the right-of-way ordinance, Reynoldsburg requested that CSP relocate its overhead distribution lines in the public right of way underground. CSP relocated the lines, and Reynoldsburg paid the relocation costs. During Phase II of the project, Reynoldsburg invoked its newly enacted ordinance to require CSP to relocate overhead lines into the underground duct bank. Once again, CSP did not dispute the city's right to have the overhead power lines placed underground; rather, CSP challenged only the city's authority to order CSP to pay the cost of relocation. Therefore, these cases are irrelevant to resolving this issue.

Extraterritorial Effect of Ordinance

**{¶ 34}** Citing *Kettering v. State Emp. Relations Bd.*, 26 Ohio St.3d 50, 54, 496 N.E.2d 983 (1986), Reynoldsburg contends that whether an ordinance falls into the area of local self-government is "determined by examining 'if the regulation of the subject matter affects the general public of the state as a whole *more than* it does local inhabitants.' " (Emphasis added by Reynoldsburg.) The city answers that question by stating that the ordinance does not have a "sufficient

extraterritorial effect * * * to push the regulation out of the realm of powers of local self-government and into the realm of police powers." Reynoldsburg's partial quotation from *Kettering* gives a misleading impression of what the case stands for and distorts the holding of that case. The *Kettering* court was explaining the statewide-concern doctrine. *Id*. at 53-55. The entire statement is as follows:

{¶ 35} " 'Thus, *even if there is a matter of local concern involved,* if the regulation of the subject matter affects the general public of the state as a whole more than it does the local inhabitants *the matter passes from what was a matter for local government to a matter of general state interest.*' " (Emphasis deleted in part.) *Id*. at 54, quoting *Cleveland Elec. Illum. Co. v. Painesville*, 15 Ohio St.2d 125, 129, 239 N.E.2d 75 (1968).

{¶ 36} Contrary to Reynoldsburg's assertion, this statement is not a test to determine whether the regulation is a matter of local concern in the first instance. The city quoted only part of the statement, omitting the italicized portion of the quotation. When the entire statement is read, the meaning becomes clear: even if the regulation is a matter of local concern, the state may still invalidate the regulation if it has a greater effect on those living outside the local municipality. *See State ex rel. Evans v. Moore*, 69 Ohio St.2d 88, 89-90, 431 N.E.2d 311 (1982) ("It is a fundamental principle of Ohio law that, pursuant to the 'statewide concern' doctrine, a municipality may not, in the regulation of local matters, infringe on matters of general and statewide concern"); *Cleveland Elec. Illum. Co. v. Painesville*, 15 Ohio St.2d at 129, 239 N.E.2d 75; *State ex rel. Gordon v. Rhodes*, 156 Ohio St. 81, 90, 100 N.E.2d 225 (1951). *See also Dublin v. State*, 118 Ohio Misc.2d 18, 47-48, 769 N.E.2d 436 (2002).

{¶ 37} In the end, Reynoldsburg's claim that the ordinance is an exercise of its powers of local self-government fails. The city has offered nothing to support its claim. Moreover, the record amply demonstrates that Reynoldsburg's

ordinance was enacted as an exercise of the municipality's police powers, not as an exercise of local self-government. Therefore, the city's ordinance can be invalidated if it conflicts with the general laws of this state.

*General-Law Test*

{¶ 38} The next step is to determine whether the statute at issue is a general law. We use a four-part test to determine whether a statute is a general law: "To constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus.

{¶ 39} As a preliminary matter, Reynoldsburg argues that under the *Canton* test, CSP's tariff is not a general law, because the tariff was not passed by the General Assembly. While this is true, tariffs do not exist in a vacuum and cannot be divorced from the statutes that authorize them, and they should be viewed in the context of the commission's ratemaking authority set forth in R.C. Title 49.

{¶ 40} The General Assembly has given the commission statutory authority to review and approve tariffs. "Public utility tariffs are books or compilations of printed materials filed by public utilities with, and approved by, the commission that contain schedules of rates and charges, rules and regulations, and standards for service." *Migden-Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, ¶ 8, fn. 5. R.C. 4905.22 provides:

> All charges made or demanded for any service rendered, or to be rendered, shall be just, reasonable, and not more than the charges allowed by law or by order of the public utilities commission, and no unjust or unreasonable charge shall be made or demanded for, or in connection with, any service, or in excess of that allowed by law or by order of the commission.

Under R.C. 4905.30, all public utilities "shall print and file with the public utilities commission schedules showing all rates * * * and charges for service of every kind furnished by it." And R.C. 4905.32 states: "No public utility shall charge, demand, exact, receive, or collect a different rate * * * or charge for any service rendered, or to be rendered, than that applicable to such service as specified in its schedule filed with the public utilities commission which is in effect at that time."

{¶ 41} In *Hull v. Columbia Gas of Ohio*, 110 Ohio St.3d 96, 2006-Ohio-3666, 850 N.E.2d 1190, we held that " 'it is readily apparent that *the General Assembly has provided for commission oversight of filed tariffs*, including the right to adjudicate complaints involving customer rates and services.' " (Emphasis added.) *Id.* at ¶ 20, quoting *Kazmaier Supermarket, Inc. v. Toledo Edison Co.*, 61 Ohio St.3d 147, 151, 573 N.E.2d 655 (1991). The principle underlying Ohio's regulatory scheme is that utility rates are to be set by the commission upon hearings and evidence, and only those rates found to be fair and reasonable after such hearings may be lawfully charged. These approved rates are then set down in tariff schedules and filed with the commission. *See Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 46 Ohio St.2d 105, 114, 346 N.E.2d 778 (1976). That is, once approved, a tariff has the same binding effect as a law. *See Erie RR. Co. v. Steinberg*, 94 Ohio St. 189, 113 N.E. 814 (1916), syllabus; *Anthony Carlin Co. v. Hines*, 107 Ohio St. 328, 140 N.E. 99 (1923), paragraph one of the syllabus;

*Carter v. Am. Tel. & Tel. Co.*, 365 F.2d 486, 496 (5th Cir.1966). Accordingly, we will conduct the general-law analysis in view of the pertinent statutes.

Statewide and Comprehensive Legislative Enactment

**{¶ 42}** The first element of the general-law test requires a determination of whether the statutes at issue are a part of a statewide and comprehensive legislative enactment. There is no question that tariff schedules and the statutes that authorize tariffs are part of a comprehensive statewide enactment concerning the regulation of public utility rates, charges, and services.

**{¶ 43}** In *Kazmaier Supermarket*, we stated:

The General Assembly has created a broad and comprehensive statutory scheme for regulating the business activities of public utilities. R.C. Title 49 sets forth a detailed statutory framework for the regulation of utility service and the fixation of rates charged by public utilities to their customers. As part of that scheme, the legislature created the Public Utilities Commission and empowered it with broad authority to administer and enforce the provisions of Title 49. The commission may fix, amend, alter or suspend rates charged by public utilities to their customers. R.C. 4909.15 and 4909.16. Every public utility in Ohio is required to file, for commission review and approval, tariff schedules that detail rates, charges and classifications for every service offered. R.C. 4905.30. And a utility must charge rates that are in accordance with tariffs approved by, and on file with, the commission. R.C. 4905.22.

61 Ohio St.3d at 150, 573 N.E.2d 655. Given this statewide and comprehensive scheme, the first element of the *Canton* test is met.

Uniform Application

**{¶ 44}** The second element of the *Canton* test provides that in order to be considered a general law, a statute must apply to all parts of the state and operate uniformly throughout. Reynoldsburg argues that this prong is not met, because the tariff applies only to CSP's service territory.

**{¶ 45}** The fact that tariffs may vary from territory to territory does not undermine the uniform operation and statewide application of the tariff statutes or the tariff itself. *See, e.g., Marich*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, at ¶ 21. The tariff statutes create a process for approving and enforcing tariffs that applies uniformly throughout the state. As previously noted, utility rates and charges are fixed by the commission and set down in tariff schedules, to which the utility is bound to adhere. Likewise, the utility's customers cannot pay a rate or a charge for service that differs from that set forth in the utility's tariff filing. *See* R.C. 4905.22, 4905.30, and 4905.32; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 46 Ohio St.2d at 116, 346 N.E.2d 778 ("the only proper rate is that set out in the approved rate schedule on file with the commission and open to public inspection, and * * * this schedule can be changed only by order of the commission").

**{¶ 46}** Thus, while utility rates and charges may differ based on the utility's service territory, the fact remains that the statutes authorizing tariffs do not limit "regulation to certain parts of the state"; nor do they "provide different rules for different areas"; they broadly apply to "to all parts of the state." *Marich*, at ¶ 21. Thus, this element is satisfied.

Police, Sanitary, or Similar Regulations

**{¶ 47}** The third part of the test mandates that statutes set forth police, sanitary, or similar regulations instead of merely granting or limiting a municipality's power to create such regulations. The statutes creating the Public Utilities Commission of Ohio and conferring authority upon it to regulate and to

set rates for the services rendered and commodities furnished by public utilities are an exercise of the police power by the General Assembly. *Cleveland Tel. Co. v. Cleveland*, 98 Ohio St. 358, 121 N.E. 701 (1918), syllabus. *See also State ex rel. Klapp v. Dayton Power & Light Co.*, 10 Ohio St.2d 14, 225 N.E.2d 230 (1967), paragraph two of the syllabus; *State ex rel. Brainard v. McConnaughey*, 137 Ohio St. 431, 436, 30 N.E.2d 699 (1940).

**{¶ 48}** CSP's tariff "specifies an at-cost price to be charged to any municipality requiring that [CSP] use its labor and skill to relocate existing overhead general distribution lines underground." *State ex rel. Columbus S. Power Co. v. Fais*, 117 Ohio St.3d 340, 2008-Ohio-849, 884 N.E.2d 1, ¶ 22. The costs for relocating overhead electrical lines underground may be "included in the rates and charges for services broadly defined" in R.C. 4905.22 and 4905.26. *Id*. at ¶ 20. Moreover, although the tariff prevents the city from imposing facility-relocation costs on CSP, neither the tariff nor the tariff statutes grant or limit the municipality's legislative police power to enact separate regulations to control and use the public right of way. Accordingly, this element is satisfied.

Prescribes a Rule of Conduct upon Citizens Generally

**{¶ 49}** The final prong is that the statute prescribe a rule of conduct upon citizens generally. The conduct rule created by the tariff statutes is clear: no public utility may charge a rate for a service or commodity furnished by it unless that rate is approved by the commission and set down in tariff schedules filed with the commission. Likewise, the utility's customers are bound to pay the rate that is set forth in the utility's tariff filing. In short, the rule applies to all citizens of this state and does not exempt any part of the public from its purview. *See Marich*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, at ¶ 28. The statutes authorizing tariffs have extensive scope and are an integral part of the state's public-utility laws. *See, e.g., Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 24. Therefore, this element is satisfied.

*Conflict Between the State Law and the Ordinance.*

{¶ 50} The last part of the test calls for a determination of whether a conflict exists between state law and the local ordinance. This test requires consideration of "whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Struthers v. Sokol*, 108 Ohio St. 263, 140 N.E.2d 519 (1923), paragraph two of the syllabus. Since the instant concern is with only the cost provisions of the tariff and the ordinance, we examine only those provisions. Section 17 of CSP's tariff requires municipalities and other public authorities to pay the cost of requiring CSP to relocate overhead electric utility lines underground; and Reynoldsburg City Code 907.06(A)(4) requires public utilities to pay the cost to bury overhead power lines. Thus, a conflict exists between the tariff and the ordinance.

*Home-Rule Conclusion*

{¶ 51} Reynoldsburg's right-of-way ordinance is an exercise of the municipality's police power, and the cost provision of the ordinance conflicts with CSP's commission-approved tariff, a general law. Thus, the cost provision of the tariff is constitutional and prevails over the conflicting ordinance.

**Common-Law Claim**

{¶ 52} Reynoldsburg has also asserted a common-law claim under its first proposition of law, contending that the commission's order should be reversed because it is contrary to the longstanding common-law rule requiring utilities to bear the entire cost of relocating utility lines from the public right of way.

{¶ 53} In accordance with common law, utilities have been required to relocate power lines from the right of way at their own expense whenever requested to do so by state or local authorities. *See Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Virginia*, 464 U.S. 30, 35, 104 S.Ct. 304, 78 L.Ed.2d 29 (1983); *New Orleans Gaslight Co. v. Drainage Comm. of New Orleans*, 197 U.S. 453, 460-462, 25 S.Ct. 471, 49 L.Ed. 831 (1905);

*Columbus Gaslight & Coke Co. v. Columbus*, 50 Ohio St. 65, 33 N.E. 292 (1893); *Ganz v. Ohio Postal Tel. Cable Co.*, 140 F. 692 (6th Cir.1905); *Perrysburg v. Toledo Edison Co.*, 171 Ohio App.3d 174, 2007-Ohio-1327, 870 N.E.2d 189 (6th Dist.) (applying the common-law rule when a public utility had asserted an unlawful taking for forced relocation of utility facilities at the utility's expense); *AT&T Corp. v. Toledo*, 351 F.Supp.2d 744 (N.D.Ohio 2005) (same).

{¶ 54} We lack jurisdiction to address this claim. Reynoldsburg failed to preserve this issue in its application for rehearing before the commission. R.C. 4903.10 provides that an application for rehearing "shall be in writing and shall set forth specifically the ground or grounds on which the applicant considers the order to be unreasonable or unlawful. No party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in the application." We have held that setting forth specific grounds for rehearing is a jurisdictional prerequisite for our review. *Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247, 638 N.E.2d 550 (1994) (citing cases). *See also Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59 (when an appellant's grounds for rehearing fail to specifically allege in what respect the PUCO's order was unreasonable or unlawful, the requirements of R.C. 4903.10 have not been met).

{¶ 55} In addition, Reynoldsburg failed to set forth this claimed error in its notice of appeal. R.C. 4903.13 (establishing that the procedure for seeking reversal of a PUCO order is through a notice of appeal "setting forth the order appealed from and the errors complained of"); *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 21.

### Statutory Claims

{¶ 56} Reynoldsburg's next claims that it has statutory authority to enact its right-of-way ordinance. Reynoldsburg cites R.C. 4939.01 et seq., 723.01 (recognizing municipal authority to regulate public ways), and 4905.65

(recognizing municipal authority to regulate use of public ways by public utilities), and it claims that these statutes bolster its home-rule authority over the public rights of way.

{¶ 57} We rejected the same argument in *Marich*, holding that a municipality needs no statutory grant of authority to control the streets within its jurisdiction, because it already possesses that power as one of its home-rule powers. This power comes from the Ohio Constitution, not the General Assembly. *Marich*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, at ¶ 8.

{¶ 58} Even were we to accept this argument, Reynoldsburg has not demonstrated how CSP's tariff contravenes this statutory authority. As noted previously, neither CSP nor the commission disputes that Reynoldsburg has authority to regulate its rights of way, including ordering CSP to bury overhead power lines located therein. The city offers no express argument or evidence as to how the cost provision of CSP's tariff circumvents the city's authority to regulate the public right of way. In short, Reynoldsburg has not demonstrated prejudice, as it must in order to obtain a reversal of a commission order. *Indus. Energy Consumers v. Pub. Util. Comm.*, 63 Ohio St.3d 551, 553, 589 N.E.2d 1289 (1992).

**Burden of Proof**

{¶ 59} In support of its third proposition of law, Reynoldsburg argues that the commission erred when it found that the city "bore the entire burden of proof with respect to the Complaint case." Reynoldsburg, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm.*, 49 Ohio St.3d 123, 126, 551 N.E.2d 145 (1990), states that as the complainant, it had the initial "burden of establishing a prima facie complaint case" showing that the tariff was unjust, unreasonable, and unlawful. According

to the city, pursuant to *Ohio Bell*,[2] once the complainant meets its initial burden—which Reynoldsburg claims it did in this case—the burden shifted to CSP to refute the evidence presented by the complainant. The city claims that the commission's improper shifting of the burden of proof "reversed the presumption of validity for legislative enactments" to which its ordinance was entitled.

{¶ 60} We lack jurisdiction to consider this argument because Reynoldsburg did not raise this issue in its application for rehearing filed with the commission. *See* R.C. 4903.10 (requiring appellant to specify error in application for rehearing). Reynoldsburg made only one "burden of proof" claim on rehearing. Citing *Ohio Bell*, the city alleged that it was "not Reynoldsburg's burden to demonstrate to the Commission that CSP could have placed its facilities in private easements; the burden to prove that defense is on CSP." The arguments set forth in the city's brief, however, are not found anywhere in its application for rehearing.

{¶ 61} "[W]hen an appellant's grounds for rehearing fail to specifically allege in what respect the PUCO's order was unreasonable or unlawful, the requirements of R.C. 4903.10 have not been met." *Discount Cellular*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59 (citing cases). Moreover, we have strictly construed the specificity test set forth in R.C. 4903.10. *Id. See also Cincinnati v. Pub. Util. Comm.*, 151 Ohio St. 353, 378, 86 N.E.2d 10 (1949) (by using the language set forth in the predecessor of R.C. 4903.10, "the General Assembly indicated clearly its intention to deny the right to raise a question on appeal where the appellant's application for rehearing used a shotgun instead of a rifle to hit that question").

---

2. Reynoldsburg's page citation to *Ohio Bell* is to the fact section of the court's opinion, rather than to the court's holding in the case. Because the city failed to preserve this issue for appeal, we do not address whether the city has properly construed *Ohio Bell*'s holding.

{¶ 62} The city also failed to raise its "burden of proof" claim in its notice of appeal, which also precludes us from considering this argument. *Ohio Partners for Affordable Energy v. Pub. Util. Comm.*, 115 Ohio St.3d 208, 2007-Ohio-4790, 874 N.E.2d 764, ¶ 14-18.

### Intervention

{¶ 63} The commission approved CSP's tariff as part of a prior rate case decided in 1992. *See In re Application of Columbus S. Power Co. for Auth. to Amend Its Filed Tariffs to Increase Rates & Charges for Elec. Serv.*, Pub. Util. Comm. No. 91-418-EL-AIR (May 12, 1992). In proposition of law four, the city challenges the commission's "finding" that " 'Reynoldsburg could have sought intervention to participate in that [prior rate] proceeding and provided comments relative' " to the cost provision of CSP's tariff, quoting the commission order. According to Reynoldsburg, the result of the commission's "finding" is that "any party who fails to intervene in a rate case is found to have waived its right to bring a subsequent complaint case before the Commission on any subject that is contained in the tariff approved during the [prior] rate case proceeding."

{¶ 64} Reynoldsburg apparently believes that the commission found that—by not intervening in the 1992 rate case—the city had forfeited its right to challenge CSP's tariff by way of a complaint proceeding filed pursuant to R.C. 4905.26. It is not clear to us how Reynoldsburg reaches that conclusion in light of the fact that it was able to prosecute its complaint case in full before the commission, including presenting evidence and filing posthearing briefs.

{¶ 65} In any event, we have recognized that R.C. 4905.26 can be used as a means of collateral attack on a prior commission proceeding. *W. Res. Transit v. Pub. Util. Comm.*, 39 Ohio St.2d 16, 313 N.E.2d 811 (1974); *Consumers' Counsel v. Pub. Util. Comm.*, 1 Ohio St.3d 22, 24, 437 N.E.2d 586 (1982). Nothing in the record before us suggests that the commission failed to follow the law set down in these cases.

**Allegation of Commission Error in Applying the Tariff**

{¶ 66} In proposition of law five, Reynoldsburg maintains that the commission erred in finding that the tariff applies to the specific facts of this case. The city claims that Section 17 of the tariff does not apply to the city's decision to require utilities to place overhead power lines underground. The city notes that the tariff language specifies that CSP "shall not be required to construct general distribution lines underground unless the cost of such special construction * * * shall be paid for by that municipality." According to Reynoldsburg, it never "required" CSP to construct power lines underground. The city asserts that CSP had a choice: (1) it could continue to operate in the right of way and place its electric lines underground or (2) it could forgo operating in the right of way and place its lines in private easements. Reynoldsburg argues that because CSP chose the former, it was subject to the city's ordinance.

{¶ 67} The record here contains ample evidence to support the commission's decision. First, the parties' agreed statement of facts states that Phase II of the Main Street Project "*required* that all utilities in the City's Main Street right-of-way be placed underground." (Emphasis added.) Reynoldsburg even constructed an underground duct bank—at its own expense and at a cost of over $816,000—for the relocation of facilities in the right of way. In fact, city officials referred to the underground right of way as the "AEP duct bank."

{¶ 68} Second, Reynoldsburg's Public Service Director Reichard testified that both Phase I and Phase II of the Main Street Project required the relocation of overhead electric lines underground. According to Reichard, the city council and the city administration decided as part of the overall Main Street Project that utilities would have to relocate lines underground. Reynoldsburg's mayor corroborated Reichard's testimony when he testified that relocating utility lines into the underground duct bank was part of a larger plan to revitalize and upgrade Main Street.

**{¶ 69}** Third, in October 2004, Reynoldsburg applied for a grant from the Franklin County Community Development Block Grant & HOME Program to fund Phase II of the Main Street Project. In its grant application, the city represented that "the existing overhead utilities will be removed and replaced underground." The application also identified as "a major problem" the "massive conflicting overhead wires which must be underground in order for the City to proceed with its comprehensive streetscape program in the same area." And finally, the city stated that "[w]ith the undertaking of this project, thru the financial assistance of CDBG funding, the massive overhead wires will be underground into a concrete duct bank."

**{¶ 70}** Fourth, Reichard sent a letter to CSP on July 8, 2008, indicating that Reynoldsburg would soon begin construction of Phase II of the Main Street Project. Reichard's letter further stated that the city had "designated that the portion of the public right of way within the Project *shall* accommodate only utility facilities located underground." (Emphasis added.) The letter then gave CSP "notice" that CSP would "be *required* to relocate their respective facilities within the public right of way of the Project into the underground duct bank." (Emphasis added.) Reichard's letter did not mention that CSP had the option of relocating power lines to private easements.

**{¶ 71}** Reynoldsburg counters that the commission erred when it found that (1) there was not sufficient time for CSP to obtain private easements and (2) CSP's only option was to relocate its lines into the underground duct bank. The city argues that the commission misread Reichard's July 8 letter when it found that the letter set forth only a "limited 90-day time frame" for relocating the lines.

**{¶ 72}** The commission did misconstrue Reichard's reference to a 90-day time frame. Reichard's letter stated that CSP had 60 days from when it received written notice that the construction of the duct bank was completed to relocate the lines. The letter estimated that the underground duct would be completed on or

about October 15, 2005. Therefore, CSP had approximately five months to bury the lines, instead of 90 days as the commission found. Even so, the commission's error does not warrant reversal, because the city has not demonstrated prejudice. *Indus. Energy Consumers v. Pub. Util. Comm.*, 63 Ohio St.3d at 553, 589 N.E.2d 1289.

{¶ 73} First, although Reynoldsburg cited evidence that CSP does use private easements for the placement of certain facilities, the city has offered no evidence that CSP had the option to do so in this case. The evidence in this case demonstrates that the city "required" CSP to relocate electric lines in the right of way underground. The city offers no evidence, however, that it presented CSP with an option of using private easements for relocation. In fact, the city paid over $816,000 to construct an underground duct bank—referred to as the AEP duct bank by city officials—for CSP to place power lines into. This raises the question why Reynoldsburg would spend this much money if it intended to give CSP the option of relocating lines onto private easements. Moreover, the city says nothing about how allowing CSP to relocate lines to private easements would diminish the safety and aesthetic benefits of burying electric power lines that were so integral to the Main Street Project.

{¶ 74} Second, even if this option had been available to CSP, the city has not shown that it was possible to relocate lines to private easements, even under the five-month time frame presented in Reichard's letter. Nothing before the court reflects whether any private property along the routes of the proposed relocation would be able to accommodate CSP's facilities or whether the owners of that property would even consider allowing CSP to place facilities onto their property.

{¶ 75} As a final matter, Reynoldsburg counters that CSP offered no evidence that it did not have sufficient time to relocate lines to private easements.

But the city raised this issue at the commission, not CSP. As the complainant before the commission, the city had that burden.

{¶ 76} We conclude that sufficient evidence existed to support the commission's finding that the city required CSP to relocate the existing overhead power lines underground.

### Commission's Interpretation of Tariff Language

{¶ 77} Reynoldsburg asserts in its final proposition of law that the commission misconstrued and improperly applied the language of the tariff. The city maintains that the operative language of the tariff required the commission to determine the relative contributions of Reynoldsburg and CSP to the total cost of relocation.

{¶ 78} The language of the tariff at issue here provides:

The company shall not be required to construct general distribution lines underground unless the cost of such special construction for general distribution lines and/or the cost of any change of existing overhead general distribution lines to underground which is required or specified by a municipality or other public authority (to the extent that such cost exceeds the cost of construction of the Company's standard facilities) shall be paid for by that municipality or public authority. The "cost of any change" as used herein, shall be the cost to the Company of such change. The "cost of special construction" as used herein, shall be the actual cost to the Company in excess of the cost of standard construction.

{¶ 79} Reynoldsburg notes that the tariff contemplates two types of construction: (1) "special construction for general distribution lines" and (2) a

"change of existing overhead general distribution lines to underground." The parties agree that "standard facilities" refers to above-ground lines and "special construction for general distribution lines" involves constructing electric service lines underground in an area where no power lines had previously been constructed.

**{¶ 80}** Reynoldsburg states that the parenthetical—"(to the extent that such cost exceeds the cost of construction of the Company's standard facilities)"—uses the phrase "such cost" without identifying which costs are implicated. The city argues that this, coupled with the placement of the parenthetical after the second of the two types of construction, means that the parenthetical applies to both new construction and relocation. Thus, in Reynoldsburg's view, the city is responsible only for the cost of relocating the lines in excess of what it would have cost CSP to move the lines from one above-ground location to another.

**{¶ 81}** Reynoldsburg, however, fails to take into account the remainder of the paragraph. The first sentence following the parenthetical phrase states that the " 'cost of any change' * * * shall be the cost to the Company of such change." That is, the "*cost of any change* of existing overhead general distribution lines to underground" in the first sentence is defined in the second sentence as "the *cost to the Company* of such change." (Emphasis added.) And the last sentence of the paragraph provides that the " 'cost of special construction' * * * shall be the actual cost to the Company *in excess of the cost of standard construction*." In short, these two sentences cure any ambiguity created by the placement of the parenthetical. Therefore, the commission correctly found that the city is required to pay CSP's entire costs for relocating the power lines underground.

## CONCLUSION

{¶ 82} Because none of Reynoldsburg's propositions of law is well taken, we affirm the orders of the commission.

Orders affirmed.

O'CONNOR, C.J., and LUNDBERG STRATTON, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

PFEIFER, J., concurs in judgment only.

_____

Taft, Stettinius & Hollister, Mark S. Yurick, and Jason H. Beehler; and James E. Hood, Reynoldsburg City Attorney, for appellant.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Thomas G. Lindgren and Devin D. Parram, Assistant Attorneys General, for appellee.

Matthew J. Satterwhite, Marilyn McConnell, and Steven T. Nourse; and Porter, Wright, Morris & Arthur and Kathleen M. Trafford, for intervening appellee.

Elizabeth H. Watts and Amy B. Spiller, urging affirmance for amicus curiae Duke Energy Ohio, Inc.

Thompson Hine, L.L.P., Scott A. Campbell, Kurt P. Helfrich, and Michael L. Dillard, urging affirmance for amicus curiae Ohio Rural Electric Cooperatives, Inc.

_____