[Cite as *Lima v. Stepleton*, 2013-Ohio-5655.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

CITY OF LIMA,

    PLAINTIFF-APPELLEE,             CASE NO. 1-13-28

    v.

THEODORE T. STEPLETON,         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Lima Municipal Court
Trial Court No. 12CRB03487

Judgment Reversed and Cause Remanded

Date of Decision:   December 23, 2013

APPEARANCES:

    *Michelle L. Baumeister* for Appellant

    *Tammie K. Hursh* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Theodore Stepleton, appeals the judgment of the Lima Municipal Court convicting him of failure to confine a vicious dog and fining him $50.00.  On appeal, Stepleton argues that the trial court erred by: (1) failing to dismiss the criminal complaint due to lack of proper service; (2) denying him an opportunity to rebut the evidence suggesting that the subject dog was vicious in an administrative hearing; (3) ruling that the City of Lima's vicious dog ordinance does not conflict with the Revised Code's treatment of vicious dogs; (4) finding that the subject dog was "vicious" under the City's ordinance; and (5) purportedly ignoring the Revised Code's treatment of vicious dogs when performing its home rule analysis.  For the reasons that follow, we reverse the trial court's judgment.

{¶2} On November 19, 2012, a criminal complaint was filed in Lima Municipal Court charging Stepleton with one count of failure to confine a vicious dog in violation of Lima City Ordinance ("LCO") 618.125(D), a minor misdemeanor.  The complaint arose from an incident on November 16, 2012 in which Stepleton allegedly failed to keep his dog confined on his property.  At the November 30, 2012 arraignment hearing, Stepleton pleaded not guilty to the count charged in the complaint.

{¶3} On January 3, 2013, Stepleton moved to dismiss the criminal complaint. The basis for the motion was the alleged lack of sufficient process and the purported conflict between LCO 618.125(D) and the Revised Code, which rendered the ordinance unconstitutional. On that same day, Stepleton requested a hearing to rebut evidence suggesting that his dog was "vicious."

{¶4} On January 14, 2013, the magistrate granted Stepleton's request for a hearing regarding the dog's status as "vicious." In granting the request, the magistrate "order[ed] a hearing date be set to hear evidence as to the proper designation of [Stepleton's] dog * * *. The hearing date shall precede any date for the trial [in this matter]." (Docket No. 10). However, there is no indication in the record before us that the hearing was either scheduled for a specific date or actually held.

{¶5} On March 1, 2013, the City filed its response to Stepleton's motion and request.

{¶6} On March 18, 2013, the magistrate issued a decision denying Stepleton's motion to dismiss. It found that LCO 618.175(D) was not in conflict with the Revised Code and was therefore constitutional under the Home Rule Amendment to the Ohio Constitution. Stepleton filed objections to the

magistrate's decision on March 26, 2013. The trial court, however, overruled Stepleton's objections and adopted the magistrate's decision.[1]

{¶7} On April 30, 2013, Stepleton withdrew his not guilty plea and instead entered a no contest plea to the criminal complaint.[2] On May 3, 2013, the magistrate issued a decision journalizing Stepleton's conviction and his $50.00 fine. The magistrate's decision also included a separate section, signed by the trial court, indicating that it was the trial court's judgment to adopt the magistrate's decision as its own.

{¶8} Stepleton timely appealed the trial court's judgment, presenting the following assignments of error for our review.

### Assignment of Error No. I

**MUNICIPAL COURT ERRED BY NOT DISMISSING [THE] CASE DUE TO IMPROPER SERVICE, AS REQUIRED UNDER STATE LAW.**

### Assignment of Error No. II

**MUNICIPAL COURT ERRED BY DENYING DEFENDANT AN OPPORTUNITY TO REBUT THE PRIMA FACIE EVIDENCE (ACCORDING TO LOCAL ORDINANCE) THAT THE DOG IN QUESTION IS VICIOUS WITHOUT AN ADMINISTRATIVE HEARING, AS REQUIRED BY STATE LAW (THUS, AUTOMATICALLY SUBJECTING APPELLANT TO EXTRA REQUIREMENTS BEFORE ANY HEARING).**

---

[1] The trial court's adoption of the magistrate's decision was based on its independent review of only the briefs offered by the parties because a transcript of the hearing on Stepleton's motion was not prepared.
[2] The record does not contain a transcript of the change of plea hearing.

*Assignment of Error No. III*

**MUNICIPAL COURT ERRED BY RULING THAT LIMA'S LOCAL DOG ORDINANCE IS NOT IN CONFLICT WITH THE NEW OHIO REVISED CODE STATUTES WHICH RE-DEFINES [SIC] A VICIOUS/DANGEROUS/NUISANCE DOG AND WHICH REQUIRES [SIC] AN OPPORTUNITY FOR AN ADMINISTRATIVE HEARING BEFORE THE OWNER IS CHARGED WITH A CRIMINAL OFFENSE.**

*Assignment of Error No. IV*

**MUNICIPAL COURT ERRED BY NOT DISMISSING THE CASE BASED ON LIMA ORDINANCE WHICH IS UNCLEAR, ASSUMING THE DOG IN QUESTION HAS BEEN DEEMED VICIOUS, NEEDS TO BE CONTAINED ON ONE'S PROPERTY.**

*Assignment of Error No. V*

**MUNICIPAL COURT ERRED BY RULING THAT HOME RULE ALLOWS THE CITY OF LIMA TO IGNORE THE NEW OHIO REVISED STATUTES.**

{¶9} Due to the nature of the assignments of error, we elect to address them out of order and to discuss the third and fifth assignments together and the first, second, and fourth assignments of error together.

*Assignments of Error Nos. III & V*

{¶10} In his third and fifth assignments of error, Stepleton essentially argues that his conviction should be reversed because LCO 618.125(D) is unconstitutional under the Home Rule Amendment to the Ohio Constitution. Specifically, Stepleton asserts that LCO 618.125(D) conflicts with certain

provisions of R.C. Chapter 955. As such, he claims that the trial court erred in applying LCO 618.125(D). We agree.

*Presumption of Constitutionality*

{¶11} All legislative enactments, including ordinances enacted by a municipality, are entitled to a "strong presumption" of constitutionality. *Village of Hudson v. Albrecht, Inc.*, 9 Ohio St.3d 69, 71 (1984); *accord City of Columbus v. Kim*, 118 Ohio St.3d 93, 2008-Ohio-1817, ¶ 18; *City of Xenia v. Schmidt*, 101 Ohio St. 437 (1920), paragraph one of the syllabus. We grant such deference to legislative enactments because "the local legislative body is familiar with local conditions and is therefore better able than the courts to determine the character and degree of regulation required." *Albrecht* at 71. Due to this presumption, the party challenging an ordinance has the burden of demonstrating, beyond a reasonable doubt, that the law is unconstitutional. *Hilton v. City of Toledo*, 62 Ohio St.2d 394, 396 (1980). Moreover, when considering the constitutionality of a legislative enactment, we are called to "liberally construe [it] to save it from constitutional infirmities." *State v. Robinson*, 44 Ohio App.3d 128, 130 (12th Dist. 1989). However, in applying our liberal construction, we are not permitted to "simply rewrite laws in order to render them constitutional." *Id.*

*Home Rule Under the Ohio Constitution*

**{¶12}** The Ohio Constitution provides municipalities with "the exclusive power to govern themselves, as well as additional power to enact local health and safety measures not in conflict with the general law * * *." *Am. Fin. Servs. Assn. v. City of Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, ¶ 26; *see also Cleveland Tel. Co. v. City of Cleveland*, 98 Ohio St. 358, 380-81 (1918) (describing the general contours of the authority granted to municipalities under the Home Rule Amendment). This authorization for municipalities is contained in Article XVIII, Section 3 of the Ohio Constitution, which provide as follows:

> Municipalities shall have authority to exercise all power of local self-government and to adopt and enforce within their limits such local police, sanitary, and other similar regulations, as are not in conflict with general laws.

When considering the language of Section 3 of Article XVIII, it is important to note that "[t]he words 'as not in conflict with general laws' * * * modify the words 'local police, sanitary and other similar regulations' but do not modify the words 'powers of local self-government.' " *Rispo Realty & Dev. Co. v. City of Parma*, 55 Ohio St.3d 101, 103 (1990). As such, Section 3 "preserve[s] the supremacy of the [S]tate in matters of 'police, sanitary and other similar regulations' while granting municipalities sovereignty in matters of local self-government, limited by

-7-

other constitutional provisions." *City of Canton v. Whitman*, 44 Ohio St.2d 62, 65 (1975).

{¶13} Soon after the Home Rule Amendment's adoption in 1912, the Supreme Court of Ohio stated that "[t]he object of the home rule amendment was to permit municipalities to use [their] intimate knowledge and determine for themselves in the exercise of all powers of local self-government how * * * local affairs should be conducted." *Froelich v. City of Cleveland*, 99 Ohio St. 376, 385 (1919). The Court has continually identified this principle as the basic purpose of the Home Rule Amendment. *See, e.g.*, *N. Ohio Patrolmen's Benevolent Assn. v. City of Parma*, 61 Ohio St.2d 375, 379 (1980) ("The purpose of the Home Rule Amendments was to put the conduct of municipal affairs in the hands of those who know the needs of the community best, to-wit, the people of the city.").

{¶14} Based on the expansive language of the Home Rule Amendment, reviewing courts have previously recognized that the amendment "grants a significant degree of sovereignty" to municipalities. *City of Tiffin v. McEwen*, 130 Ohio App.3d 527, 531 (3d Dist. 1998). Further, because of the important policy goals served by the Home Rule Amendment and the autonomy it secures for municipal citizens, we must be "sensitive to the home rule authority of municipalities." *The Payphone Assn. of Ohio v. City of Cleveland*, 146 Ohio App.3d 319, 328 (8th Dist. 2001). As a result, the general laws of the State and

the challenged ordinance should be harmonized as much as the language allows. *N. Ohio Patrolmen* at 377. Nevertheless, we must also recognize that municipalities' home rule authority "is not absolute." *Tiffin* at 531; *accord Weir v. Rimmelin*, 15 Ohio St.3d 55, 56 (1984) ("The Home Rule Amendment to the Ohio Constitution confers a significantly high degree of sovereignty upon municipalities. However, the amendment does not provide cities the absolute power of self-government.").

{¶15} The Supreme Court of Ohio has issued a three-part test for courts to apply when determining whether a municipal ordinance is constitutionally sound under the Home Rule Amendment. This test was most recently defined as follows:

> The first step is to determine whether the ordinance involves an exercise of local self-government or an exercise of local police power. If the ordinance relates solely to self-government, the analysis ends because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction. The second step, which becomes necessary only if the local ordinance is an exercise of police power, requires a review of the state statute to determine whether it is a general law under the court's four-part test announced in *City of Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, syllabus. If the statute qualifies as a general law under this test, the final step is undertaken to determine if the ordinance is in conflict with the statute.

*In re Complaint of Reynoldsburg*, 134 Ohio St.3d 29, 2012-Ohio-5270, ¶ 24. Here, the City has conceded that LCO 618.125(D) is an exercise of the police

power and that R.C. Chapter 955 is a general law. Appellee's Brief, p. 8. Thus, the only issue before us is whether LCO 618.125(D) conflicts with R.C. Chapter 955.

*Applicable Tests for Conflict Analysis*

{¶16} Conflicts between local ordinances and state statutes may arise in a variety of circumstances. As such, three different tests may be employed to determine whether such an ordinance/statute conflict exists. *See generally Mendenhall v. City of Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, ¶ 29-37 (describing the three tests). This matter implicates the "contrary directives" test, *id*. at ¶ 29, which requires a reviewing court to consider "whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa," *Village of Struthers v. Sokol*, 108 Ohio St. 263 (1923), paragraph two of the syllabus. If we answer this question in the negative, then no conflict exists. *See id.* at 268 ("No real conflict can exist unless the ordinance declares something to be right which the state law declares to be wrong, or vice versa."). When applying the contradictory directives test, we note that the degree of state regulation on the same issue as the local ordinance is immaterial. *See City of Cincinnati v. Hoffman*, 31 Ohio St.2d 163, 169 (1972) ("[I]n order for * * * a conflict to arise, the state statute must positively permit what the ordinance prohibits, or vice versa, regardless of the extent of state regulation concerning the same object.").

**{¶17}** Before applying this test, we must address the proper scope of our conflict analysis. Here, Stepleton argues that LCO 618.125(D) conflicts with R.C. 955.11(A)(1), 955.221(B)(3), and 955.222(A). After reviewing these Revised Code provisions, we find that there are two difficulties with fitting them into a proper conflict analysis under the Home Rule Amendment. First, R.C. 955.221(B)(3) is inapplicable in a conflict analysis here insofar as it relates to a direct conflict between LCO 618.125 and the Revised Code. Rather than being a potential source of a direct conflict, R.C. 955.221(B)(3) is merely a truism that reasserts the Ohio Constitution's limitation of municipalities' home rule authority over police regulations. *Compare* Ohio Constitution, Article XVIII, Section 3 ("Municipalities shall have authority * * * to adopt and enforce within their limits such local police, sanitary, and other similar regulations, as are not in conflict with general laws.") *with* R.C. 955.221(B)(3) ("A municipal corporation may adopt and enforce ordinances within the municipal corporation that are not otherwise in conflict with any other provisions of the Revised Code."). Accordingly, we disregard R.C. 955.221(B)(3) when considering a direct conflict with LCO 618.125(D).[3]

---

[3] This provision may be pertinent to an indirect conflict under the "conflict by implication" test since R.C. 955.221(B)(3) relates to the General Assembly's intent to control the subject exclusively. *Mendenhall* at ¶ 31-32. However, unlike the dissent, we do not believe this matter implicates this test for conflicts so the provision is ultimately immaterial in our analysis.

{¶18} Second, both R.C. 955.222(A), which provides for an administrative determination of a dog's designation as "dangerous," and the statutory definition of "dangerous dogs" in R.C. 955.11(A)(1), are not proper starting points for the conflict analysis in this matter. In *City of Cincinnati v. Baskin*, 112 Ohio St.3d 279, 2006-Ohio-6422, the parties and the court of appeals made the statutory definition contained in R.C. 2923.11(E) "the focal point of their inquiry." *Id*. at ¶ 11. However, the Supreme Court declared that rather than focusing on the statutory definitions, the parties should have focused on the statutory prohibition contained in R.C. 2923.17(A) and the relevant definitions and other provisions that influenced its meaning. *Id*. at ¶ 12.

{¶19} We follow *Baskin*'s guidance in forming our analysis here. LCO 618.125(D) essentially proscribes individuals from allowing vicious dogs to go unconfined on their properties. The ordinance also has particular meanings for the terms "vicious dogs" and "unconfined." After reviewing R.C. Chapter 955, we find that LCO 618.125(D)'s closest analogue is R.C. 955.22(D)(1), which likewise has its own particular definitions and counterparts within the Revised Code. As such, we start our conflict analysis by comparing LCO 618.125(D) with R.C. 955.22(D)(1) as opposed to the statutory sections cited by Stepleton.

Case No. 1-13-28

*Relevant Precedents in Conflict Analysis*

{¶20} When considering the possible conflict between LCO 618.125(D) and R.C. 955.22(D)(1), we are unable to find much helpful guidance from the Ohio Supreme Court or other courts. In *City of Youngstown v. Traylor*, 123 Ohio St.3d 132, 2009-Ohio-4184, the Supreme Court of Ohio addressed the narrow issue of "whether a Youngstown ordinance that requires vicious dogs to be confined and requires the [S]tate to prove at trial that the dog is vicious or dangerous as an element of the offense violates procedural due process." *Id.* at ¶ 1. As a result of this narrow issue, the Court merely held that the Youngstown ordinance "is rationally related to the city's legitimate interest in protecting citizens from vicious dogs and is therefore constitutional." *Id.* at syllabus. As noted by the dissenting justices, the majority did not address the Youngstown ordinance's consistency with the Home Rule Amendment "in large part because the parties did not argue the issue." *Id.* at ¶ 35 (Pfeifer & Lanzinger, J.J., dissenting).[4] Since *Traylor* did not involve a home rule analysis, we are unable to find that it controls here.

{¶21} In support of its argument, the City has cited to a variety of other cases upholding local ordinances that regulate the keeping of vicious dogs.

---

[4] We note that the dissenting justices in *Traylor* indicated they believed that the Youngstown ordinance, which is quite similar to the ordinance implicated here, was unconstitutional under the Home Rule Amendment. *Traylor* at ¶ 34 (Pfeiffer & Lanzinger, J.J., dissenting).

-13-

However, like *Traylor*, many of these cases are of limited import since they do not apply a home rule analysis to vicious dog ordinances in relation to the current version of R.C. Chapter 955. *See City of Columbus v. Kim*, 118 Ohio St.3d 93, 2008-Ohio-1817, ¶ 7-11 (upholding municipal ordinance regarding animal noise against a void for vagueness challenge); *City of Toledo v. Tellings*, 114 Ohio St.3d 278, 2007-Ohio-3724, ¶ 30 (upholding municipal ordinance regarding confinement of vicious dogs against procedural due process, substantive due process, equal protection, and void for vagueness challenges); *City of Steubenville v. Thorne*, 7th Dist. Jefferson No. 08 JE 3, 2008-Ohio-6299, ¶ 2 (upholding municipal ordinance regarding harboring of barking dog against void for vagueness and overbreadth challenges); *State v. Conte*, 10th Dist. Franklin No. 07AP-33, 2007-Ohio-5924, ¶ 18 (upholding vicious dog ordinance against due process challenge); *Singer v. City of Cincinnati*, 57 Ohio App.3d 1 (1st Dist. 1990), paragraph three of the syllabus (upholding municipal ordinance regarding ownership of pit bulls against equal protection and due process challenges).

{¶22} The only cases that we find in which courts have explicitly determined whether a dog ordinance violates the Home Rule Amendment are *City of Akron v. Ross*, 9th Dist. Summit No. 20338, 2001 WL 773235 (July 11, 2001), and *Tarquinio v. City of Lakewood*, N.D. Ohio No. 1:11 CV 325, 2011 WL 4458165 (Sept. 23, 2011). We discuss each of these cases below in turn.

{¶23} In *Ross*, the defendant was convicted of violating Akron City Code 92.25(B)(4), which prohibited owning, harboring, or possessing a dog that had bitten a person while off the owner's premises. * 1. The defendant appealed, asserting that the ordinance was unconstitutional under the Home Rule Amendment since it conflicted with certain provisions of R.C. Chapter 955. *Id.* at * 2. The Ninth District rejected the defendant's constitutionality challenge and found no conflict. *Id.* at * 4. Specifically, the court found no conflict even though the ordinance inculpated owners for their dogs' first bites while the Revised Code did not. *Id.* The court reasoned that "the Revised Code simply does not provide a penalty for the first bite of a dog; it does not permit or encourage it. * * * We can discern no conflict here, as the Revised Code simply does not speak to the issue of the first bite of a non-vicious dog; rather this issue is left to be resolved by local enactment pursuant to R.C. 955.221." *Id.*[5]

{¶24} Meanwhile, in *Tarquinio*, the plaintiff sought a declaratory judgment that a local ordinance banning the keeping of pit bull dogs was unconstitutional under the Home Rule Amendment. * 1. The federal district court for the Northern District of Ohio, however, denied the requested relief and instead found that the ordinance was constitutional. *Id.* The district court reasoned as follows regarding

---

[5] The Ninth District also rejected the defendant's argument that there was an impermissible conflict due to the differing levels of criminal and civil liability imposed under the ordinance and Revised Code. *Ross*, *supra*.

the purported conflict between the ordinance and R.C. Chapter 955's requirements

that owners of vicious dogs take certain safety precautions:

> The state statute sets forth limitations and obligations that must be undertaken by any person who owns or harbors a vicious dog, which under the statute includes all pit bulls, including restrictions on how the dog must be contained, leashed, and handled. The state statute does not explicitly permit pit bulls, or any dogs for that matter, to be owned or harbored by every state resident. Therefore the ordinance banning pit bulls [sic] dogs from Lakewood does not prohibit anything that state law explicitly permits.

*Id.* at * 2.

{¶25} The district court also found no constitutional infirmity stemming

from the ordinance's and Revised Code's differing definitions of pit bull dog.

Former R.C. 955.11 indicated that R.C. Chapter 955's provisions applied to a dog

that "[b]elongs to a breed that is commonly known as pit bull dog." However, the

ordinance's definition of pit bull dog was " 'any dog known as pit bull, pit bull

dog, or pit bull terrier,' which [was] further defined as 'any dog of mixed breed

which has the appearance and characteristics of being predominantly of such

breed.' " *Id.* at * 3. The district court viewed the statute's and ordinance's

language to have, "in all practicality, * * * the same effect." *Id.* The district court

also noted that "[t]he state statute does not limit the designation of dangerous [or]

vicious dogs to a particular breed or type of dog, nor to any one particular

behavior. Therefore, the [ordinance] does not prohibit something that the state statute explicitly or implicitly allows." *Id*. at * 4.

{¶26} While *Ross* and *Tarquinio* are helpful in illustrating the type of statutory distinctions between municipal dog ordinances and provisions in R.C. Chapter 955 that do not produce conflicts, we must note that there are several deficiencies in both cases that preclude us from considering them as being on-point. First, *Tarquinio* is a federal case interpreting the Ohio Constitution. This is problematic because Ohio courts, not federal courts, are the final arbiters of our Ohio Constitution's proper interpretation. *See Preterm Cleveland v. Voinovich*, 89 Ohio App.3d 684, 707 (10th Dist. 1993) ("[T]his court is completely free to interpret the Ohio Constitution without adherence to the outcome of court decisions in similar cases on the federal level."). Second, neither case specifically interprets LCO 618.125(D) or an ordinance with substantially similar language to it. And, finally, neither case implicates the newly revised provisions of R.C. Chapter 955. Nevertheless, due to the dearth of other relevant case law, we must employ the illustrations of *Ross* and *Tarquinio*, as well as the home rule analysis principles announced by the Ohio Supreme Court, in resolving this matter.

*LCO 618.125(D) and R.C. 955.22(D)(1)*

{¶27} LCO 618.125(D) provides that "[n]o person who owns, harbors, or has the care, custody, or control of a vicious dog shall permit such dog to go

-17-

unconfined on the premises where such dog is located." LCO 618.125(C)(1), meanwhile, defines a "vicious dog" as follows:

> (a) Any dog with a propensity, tendency, or disposition to attack, bite, cause injury to, or which otherwise endangers the safety of, or which attempts to attack, bite, cause injury to, or endanger the safety of, a human being or domestic animal; or,
>
> (b) Any dog which attacks, bites, causes injury to, or otherwise endangers the safety of, a human being or other domestic animal one or more times, with or without provocation; or
>
> (c) Any dog which belongs to a breed that is commonly known as a pit bull dog. The ownership, keeping, custody, control, or harboring of such a breed of dog shall be prima facie evidence of the ownership, keeping, custody, control, or harboring of a vicious dog.

The City also defines "unconfined" as follows:

> (a) When a vicious dog is indoors, "unconfined" shall mean not being restrained in a manner that will prevent the dog from being able to come into physical contact with anyone lawfully in such premises, unless the person lawfully in such premises has specifically consented to such dog being unconfined while in his or her presence.
>
> (b) When a vicious dog is outdoors, "unconfined" shall mean not being confined in a securely enclosed and locked pen or structure which prevents the dog from escaping therefrom. Such pen or structure must have secure sides and a secure top. If the pen or structure has no bottom secured to the sides, the sides must be embedded into the ground not less than one foot deep.

LCO 618.125(C)(2).

R.C. 955.22(D)(1) similarly provides, in pertinent part, as follows:

> [N]o owner, keeper, harborer, or handler of a dangerous dog shall fail to do * * * the following:
>
> While the dog is on the premises of the owner, keeper, or harborer, securely confine it at all times in a locked pen that has a top, locked fenced yard, or other locked enclosure that has a top.

Although LCO 618.125(D) refers to "vicious dogs," the Revised Code uses the term "dangerous dog" to refer to the same type of dogs as LCO 618.125(D). R.C. 955.11(A)(1) defines "dangerous dog" as follows:

> (a) "Dangerous dog" means a dog that, without provocation and subject to division (A)(1)(b) of this section, has done any of the following:
>
> (i) Caused injury, other than killing or serious injury, to any person;
>
> (ii) Killed another dog;
>
> (iii) Been the subject of a third or subsequent violation of division (C) of section 955.22 of the Revised Code.
>
> (b) "Dangerous dog" does not include a police dog that has caused injury, other than killing or serious injury, to any person or has killed another dog while the police dog is being used to assist one or more law enforcement officers in the performance of their official duties.

{¶28} "Without provocation" means that the "dog was not teased, tormented, or abused by a person, or that the dog was not coming to the aid or the defense of a person who was not engaged in illegal or criminal activity and who was not using the dog as a means of carrying out such activity." R.C. 955.11(A)(7).

{¶29} After reading LCO 618.125(D) and the relevant definitions of the terms used in it, we find that it essentially requires dog owners to keep "vicious dogs" in a "locked pen that has secure sides and a secure top" when the dog is outdoors, LCO 618.125(C)(2)(b), and "restrained" when the dog is indoors, LCO 618.125(C)(2)(a). This general requirement, taken at face value, is parallel to R.C. 955.22(D)(1)'s requirement that dog owners keep "dangerous dogs" in a "locked pen that has a top, locked fenced yard, or other locked enclosure that has a top."

{¶30} However, when we delve more into the statutory language of LCO 618.125(D) and R.C. 955.22(D)(1), we find that LCO 618.125(D) proscribes conduct that is allowed by R.C. 955.22(D)(1). The ambit of "vicious dogs" is much more expansive under LCO 618.125(D) than the ambit of "dangerous dogs" under R.C. 955.22(D)(1). Pursuant to LCO 618.125(C)(1), vicious dogs include those with the propensity to cause injury, those that have previously attacked or endangered the safety of a person and caused injury, and those that belong to the pit bull breed. Supplying this definition to LCO 618.125(D), we find that the ordinance forbids the following dog owners, among others, from failing to confine a "vicious dog" in a secured pen:

> (1) The owner of a pit bull dog whose dog has never previously injured a person or killed another dog or was unrestrained on three previous occasions in violation of R.C. 955.22(C);

(2)   The owner of a dog with the disposition to attack, bite, cause injury to, or otherwise endanger the safety of a person or other animals, but has yet to actually do so;

(3)   The owner of a police dog that has previously injured a person or killed another dog in the course of assisting law enforcement with official duties;

(4) The owner of a dog, who is lawfully engaged in hunting or is training his or her dog for the purpose of hunting;[6] and

(5) The owner of a dog who has previously injured a person or killed another dog, but the dog was provoked.

{¶31} In contrast, R.C. 955.11(A)(1) only defines dogs that, "without provocation," have "caused injury" to a person, "killed another dog," or have been unrestrained in violation of R.C. 955.22(C) on at least three previous occasions as "dangerous."  R.C. 955.11(A)(1) also includes a critical exemption for police dogs who injured a person or killed another dog while assisting law enforcement officers with their official duties.  R.C. 955.11(A)(1)(b).  Further, R.C. 955.22(D) contains an exemption for dogs that are lawfully engaged in training for the

---

[6] We note that in Lima, an owner of a dog can never be *lawfully* engaged in hunting, since hunting is prohibited within the municipality.  LCO 618.13.  However, Lima does not have an ordinance which prohibits the training of animals to hunt within its municipal borders.

purpose of hunting. Thus, R.C. 955.22(D)(1) allows the dog owners described in the examples above to forego confining their dogs in a secured pen.[7]

{¶32} The dissent limits its analysis to whether LCO 618.125(D) conflicts with R.C. 955.22(D)(1), excluding the definitional sections contained elsewhere in both the ordinance and the Revised Code. In support of this position, the dissent, like us, relies upon *Baskin*. However, while we find that *Baskin* is distinguishable from the present matter, the dissent misinterprets *Baskin* and finds it analogous.

{¶33} In *Baskin*, the Revised Code prohibited carrying a concealed semiautomatic firearm capable of firing over 31 rounds, while the municipal ordinance proscribed carrying a semiautomatic firearm capable of firing over 10 rounds. 2006-Ohio-6422, ¶ 17-18. To find that a conflict existed, the statute had to have been interpreted "to not only prohibit the possession of any semiautomatic firearm that can fire more than 31 rounds without reloading, but to also *imply a right* to the possession of any semiautomatic firearm that can fire up to 31 rounds without reloading." (Emphasis added.) *Id.* at ¶ 21. As the Court could not find that the right was implied, the statute and ordinance were not in conflict. *Id.* at ¶ 25. Further, the Ohio Supreme Court noted that there was no provision in the

---

[7] We also note that the former version of R.C. Chapter 955 defined pit bulls as "vicious dogs," but that definition was repealed in 2012 by Am.Sub.H.B. No. 14. The General Assembly's explicit removal of the reference to "pit bulls" in R.C. Chapter 955 clearly signals its intent that pit bulls, which are still defined as "vicious dogs" in LCO 618.125, be exempted from confinement requirements like LCO 618.125(D) and R.C. 955.22(D)(1) unless they previously injured a person or killed another dog.

Revised Code which manifested an "intent to prevent municipalities from regulating the possession of semiautomatic firearms that hold fewer than 32 rounds." *Id*. at ¶ 23. Nor was there a provision which stated that "municipalities may not prohibit the possession of lower-capacity firearms that are prohibited by the statute." *Id*.

{¶34} *Baskin* is distinguishable to the present matter because the Revised Code expressly exempts certain dogs from being subject to confinement if: (1) it had never previously injured a person or killed another dog or was unrestrained on three previous occasions in violation of R.C. 955.22(C); (2) a dog with the disposition to attack, bite, cause injury to, or otherwise endanger the safety of a person or other animal, but has yet to actually do so; (3) a police dog that has previously injured a person or killed another dog in the course of assisting law enforcement with official duties; (4) a dog that is lawfully engaged in training for the purposes of hunting; and (5) a dog that injures a person or kills another animal but acted in response to provocation. Since LCO 618.125 prohibits conduct which the Revised Code expressly permits, it is in direct conflict.

{¶35} Based on these manifest differences in the language of LCO 618.125(D) and R.C. 955.22(D)(1), we find that the two provisions submit Lima city residents to different standards of conduct as the ordinance plainly proscribes conduct that is allowed by state statute. As such, we must conclude that under the

contrary directives test, there is an impermissible conflict between LCO 618.125(D) and R.C. 955.22(D)(1) that renders LCO 618.125(D) violative of the Home Rule Amendment.

{¶36} This matter is also distinguishable from *Ross* and *Tarquinio*, which compels us to reach the opposite conclusion from the ones reached in those cases. Unlike *Ross* and *Tarquinio*, the implicated ordinance in this matter explicitly proscribes that which the Revised Code explicitly allows, as discussed above. Further, *Tarquinio* is also distinguishable because the new version of R.C. Chapter 955 has a significantly different definition of dangerous and vicious dogs. The new statute, unlike the one addressed in *Tarquinio*, does not in all practicality have the same effect as LCO 618.125(D). Due to these clear distinctions from this matter, we find that *Ross* and *Tarquinio* do not support a finding that LCO 618.125(D) is constitutional.

{¶37} In sum, LCO 618.125(D) conflicts with R.C. 955.22(D)(1) and is therefore unconstitutional under the Home Rule Amendment to the Ohio Constitution. The trial court erred by finding otherwise and applying LCO 618.125(D). Thus, Stepleton's conviction under LCO 618.125(D) was improper and we must reverse both his conviction and his sentence.

{¶38} Accordingly, we sustain Stepleton's third and fifth assignments of error.

*Assignments of Error Nos. I, II, & IV*

{¶39} The resolution of Stepleton's third and fifth assignments of error renders his remaining assignments of error moot and we consequently decline to address them. *See* App.R. 12(A)(1)(c).

{¶40} Having found error prejudicial to Stepleton in his third and fifth assignments of error, we reverse the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**SHAW, J., concurs.**
**/jlr**

**PRESTON, P.J., Dissents**

{¶37} I respectfully dissent from the majority's conclusion that LCO 618.125(D) violates Section 3, Article XVIII of the Ohio Constitution, the "Home Rule Amendment." The majority errs in concluding that LCO 618.125(D) violates the contrary directives test, and the ordinance also does not violate the conflict by implication test, because the General Assembly did not intend R.C. 955.22 to govern dog confinement exclusively. LCO 618.125(D) does not, therefore, conflict with R.C. 955.22(D)(1) for purposes of the Home Rule Amendment.

**{¶38}** The only contested issue here is whether LCO 618.125(D) conflicts with R.C. 955.22(D)(1). *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, syllabus. The majority states that three separate tests may be employed to determine if a conflict exists, and then states that LCO 618.125(D) violates the "contrary directives" test. Majority Op. at ¶ 16, 35. The first step in determining whether a conflict exists is to identify the actual *conduct* that the statute and the ordinance target. *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, ¶ 30. Generally, LCO 618.125(D) prohibits the same type of *conduct* as R.C. 955.22(D)(1)—a person's failure to confine a dog that is legislatively defined as "dangerous" (state statute) or "vicious" (local ordinance). Because the two legislative enactments prohibit the same conduct, they do not violate the contrary directives test. *Mendenhall* at ¶ 29-30.

**{¶39}** While LCO 618.125(C)(2) defines "confinement" more rigorously than R.C. 955.22(D)(1), and LCO 618.125(C)(1) defines "vicious dogs" more broadly than R.C. 955.11(A)(1)(a), that does not create a conflict under the contrary directives test. Home Rule enables a municipality such as Lima to enact ordinances that enlarge upon or supplement state law. *Cincinnati v. Baskin*, 112 Ohio St.3d 279, 2006-Ohio-6422, ¶ 23-24. "'[A]n ordinance [that] enlarges upon the provisions of a statute by requiring more than the statute requires creates no conflict therewith unless the statute limits the requirement for all cases to its own

-26-

prescription.'" *Id.* at ¶ 38 (O'Connor and Stratton, J.J., concurring) (quoting 56 American Jurisprudence 2d (1971) 408–409, Municipal Corporations, Section 374.); *Mendenhall* at ¶ 37, 42 ("complimentary" or "supplemental" ordinance does not conflict with state law).

{¶40} To find a conflict, the majority focuses not on the proscribed conduct but on dog owners who are affected differently under LCO 618.125(D) by examining the differing "confinement" requirements and differing definitions of "dangerous dog" and "vicious dog." Majority Op. at ¶ 27-31. This is strikingly similar to the Appellate Court's flawed analysis in *Baskin*. 158 Ohio App.3d 539, 2004-Ohio-5055, ¶ 14-23 (Painter, J., dissenting), overruled by *Baskin*, 112 Ohio St.3d 279, 2006-Ohio-6422.[8] The majority also makes the same erroneous assumption as the Appellate Court made in *Baskin*—that by proscribing one form of conduct (i.e., failing to confine a "dangerous dog" is prohibited), the State has licensed all conduct outside of the specific proscription (i.e., failing to confine a dog other than a "dangerous dog" is permissible). 2004-Ohio-5055, at ¶ 14-23 (Painter, J., dissenting); 2006-Ohio-6422, at ¶ 21. This analytical assumption indicates that a conflict by implication analysis was required, but the majority did

---

[8] The majority states "the two provisions submit Lima city residents to different standards of conduct as the ordinance plainly proscribes conduct that is allowed by state statute." Majority Op. at ¶ 35. Yet in *Baskin*, the local gun ordinance was held constitutional, in part, because "if a person is in compliance with the city's ordinance, he is also in compliance with the statute." 2006-Ohio-6422, at ¶ 46. The same is true here: if a person is in compliance with LCO 618.125(D), he is also in compliance with R.C. 955.22(D).

not choose to conduct such analysis. *Baskin*, 2006-Ohio-6422, at ¶ 32 ("If this court were to adopt the concept of conflict purely by implication, we would essentially be holding that a statute's prohibiting one thing is the same as permitting everything else.").

**{¶41}** The question presented in a conflict by implication test is: "whether the General Assembly indicated that the relevant state statute is to control a subject exclusively." *Mendenhall* at ¶ 32, citing *Baskin*, 2006-Ohio-6422, at ¶ 23; *Am. Financial Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, ¶ 41, 48. The General Assembly can explicitly or implicitly indicate its intent that the state statute controls a subject exclusively. *See Baskin* at ¶ 44, 47 (O'Connor, J., concurring). The former occurs when the General Assembly clearly states its intent to control a subject exclusively either in the statutory language or language in the Act. The latter may[9] occur when the General Assembly enacts comprehensive regulation in a field, uniformity is necessary to address a statewide

---

[9] I say "may" because the list of factors is not exhaustive but merely illustrative and has not been fully vetted in the case law. It is not clear whether all of these factors must be present to find a conflict by implication where the General Assembly has not explicitly indicated that intent. Given the "significant degree of sovereignty" the Home Rule Amendment provides municipalities, the sensitivity we must have to Home Rule authority, and our general duty to, whenever possible, harmonize a local ordinance with state law, courts should be hesitant to find a conflict by implication except when the General Assembly has explicitly indicated that intent or the implicit indication is overwhelming. *Tiffin v. McEwen*, 130 Ohio App.3d 527, 531 (3d Dist.1998); *Payphone Assn. of Ohio v. Cleveland*, 146 Ohio App.3d 319, 328 (8th Dist.2001); *N. Ohio Patrolman Benevolent Assn. v. Parma*, 61 Ohio St.2d 375, 377 (1980).

concern,[10] and the General Assembly allocates fresh state resources to address the state-wide concern.[11] *See id.* at ¶ 45, 57; *Am. Financial Servs. Assn.* at ¶ 55-56, 61, 66, 73.

{¶42} The General Assembly did not explicitly indicate that R.C. 955.22 govern dog control exclusively in the statutory language, like it has in other statutes. For example, in R.C. 1.63, governing loans and other forms of credit, the General Assembly stated:

> (A) The state solely shall regulate the business of originating, granting, servicing, and collecting loans and other forms of credit in the state and the manner in which any such business is conducted, and this regulation shall be in lieu of all other regulation of such activities by any municipal corporation or other political subdivision.
>
> (B) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision to regulate, directly or indirectly, the origination, granting, servicing, or

---

[10] Two key factors signal that an issue is one of statewide concern: (1) a need for uniform regulation exists, and (2) any local regulation of the matter would have extraterritorial effects. *Am. Financial Servs. Assn.* at ¶ 56, citing *State ex rel. McElroy v. Akron*, 173 Ohio St. 189, 194 (1962) (an issue of statewide concern is one that "has become of such general interest that it is necessary to make it subject to statewide control so as to require uniform statewide regulation") and *State ex rel. Evans v. Moore*, 69 Ohio St.2d 88, 90 (1982) ("municipal regulations which have significant extraterritorial effects are matters of statewide concern").

[11] Although a majority of the justices on the Ohio Supreme Court have expressly declined to adopt a preemption analysis similar to that used to determine conflicts between state and federal law, the factors Justice O'Connor identified in *Baskin* and *Am. Financial Servs. Assn.* are, nevertheless, helpful to determine the General Assembly's intent in conflict by implication cases. *Mendenhall* at ¶ 38. This list is not exhaustive but illustrative.

collection of loans or other forms of credit constitutes a conflict with the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, and with the uniform operation throughout the state of lending and other credit provisions, and is preempted.

*Am. Financial Servs. Assn.*, 2006-Ohio-6043, at ¶ 31, 33, 62-63, 68. *See also Ohioans for Concealed Carry, Inc. v. Clyde*, 120 Ohio St.3d 96, 2008-Ohio-4605, ¶ 20 ("[T]he General Assembly, by enacting R.C. 9.68(A), gave persons in Ohio the right to carry a handgun unless federal or state law prohibits them from doing so. A municipal ordinance cannot infringe on that broad statutory right."); *Baskin* at ¶ 47 (O'Connor and Stratton, J.J., concurring) (characterizing R.C. 9.68(A)'s language as "preemption language"). No such language appears in R.C. 955.22.

{¶43} The General Assembly, when enacting Am.Sub.H.B. 14, also did not amend R.C. 715.23 or 955.221(B)(3)—both affirming a municipal corporation's ability to adopt and enforce dog-control ordinances—indicating that the General Assembly intended to maintain the status quo and allow continued local dog-control regulation. Had the General Assembly intended to exclusively regulate dog control, it would have removed these Revised Code sections, and at the very least, it could have amended these sections to remove from local control the ability to regulate dog confinement, specifically.

**{¶44}** Am.Sub.H.B. 14, which amended R.C. 955.22 and 955.11, lacks language indicating the General Assembly's intent to govern dog control exclusively. Am.Sub.H.B. 14's preamble states, in pertinent part, Am.Sub.H.B. 14's purpose is "to remove pit bulls from the definition of 'vicious dog' in *state law* * * *." (Emphasis added). Compare this language to Section 9 of H.B. 12 concerning concealed weapons:

> The General Assembly finds that licenses to carry concealed handguns are a matter of statewide concern and wishes to ensure uniformity throughout the state regarding the qualifications for a person to hold a license to carry a concealed handgun and the authority granted to a person holding a license of that nature. It is the intent of the General Assembly * * * to enact laws of a general nature, and, by enacting those laws of a general nature, the state occupies and preempts the field of issuing licenses to carry a concealed handgun and the validity of licenses of that nature. No municipal corporation may adopt or continue in existence any ordinance, and no township may adopt or continue in existence any resolution, that is in conflict with those sections, including, but not limited to, any ordinance or resolution that attempts to restrict the

places where a person possessing a valid license to carry a concealed handgun may carry a handgun concealed.

After examining the statutory language of R.C. 955.22, 955.11, 715.23, and 955.221(B)(3), along with the preamble to Am.Sub.H.B. 14, a reviewing court can readily conclude that the General Assembly did not explicitly indicate its intent that R.C. 955.22 exclusively govern dog control.

{¶45} In addition, the General Assembly did not *implicitly* express its intent to exclusively regulate dog control. There is no indication that the General Assembly believed that dog confinement was a matter of statewide concern for which uniformity was necessary. The likely genesis to Am.Sub.H.B. 14 was *State v. Cowan*, 103 Ohio St.3d 144, 2004-Ohio-4777, wherein the Ohio Supreme Court struck down the prior version of R.C. 955.22 for violating due process— something the General Assembly sought to remedy by enacting R.C. 955.222. Am.Sub.H.B. 14's amendments to R.C. Chapter 955 all related to the definitions of various types of dogs, the designation and registration of various types of dogs, the confinement of various types of dogs, and penalties for failing to confine the various types of dogs as newly defined. Am.Sub.H.B. 14 did not enact a new comprehensive statutory scheme but merely modified the cooperative state and local dog control system that had been in place for years. As mentioned above, Am.Sub.H.B. 14 did not remove or amend R.C. 715.23 and 955.221(B)(3), which

allow for additional local control of dogs. Am.Sub.H.B. 14 also did not amend R.C. 955.01(A)(2), permitting the county commissioners to raise the dog registration fee from the $2.00 set in R.C. 955.01(A)(1) for certain dogs.

{¶46} Finally, the General Assembly did not dedicate fresh state resources to the field of dog control by enacting Am.Sub.H.B. 14. *Am. Financial Servs. Assn.*, 2006-Ohio-6043, at ¶ 65, 73 (O'Connor, J., concurring). County Auditors are still responsible for issuing dog tags and maintaining records of registered dogs, though Am.Sub.H.B. 14 made county auditors also responsible for issuing dangerous dog registration certificates. R.C. 955.01(A)(1), 955.012, 955.013, 955.07, 955.08, 955.22(E)(4), (I). Instead of dedicating "fresh state resources," like tax dollars to county auditors for the increased burdens Am.Sub.H.B. 14 imposed, the General Assembly increased the dog-tag-replacement fee and created a new fifty-dollar fee for dangerous dog registration certificates. R.C. 955.08, 955.22(I)(1)(a). County dog wardens[12] and local enforcement officers are still responsible for enforcing dog laws. R.C. 955.12; 955.22(E)(3), (I)(4). 1981 Ohio Atty.Gen.Ops. No. 81-037 (municipality may hire person(s) to enforce dog ordinances).

---

[12] County dog wardens are charged with enforcing state laws throughout their county, including within the municipal corporation limits, and may also enforce local ordinances through cooperative agreements. 1984 Ohio Atty.Gen.Ops. No. 84-034.

**{¶47}** Reviewing the applicable statutes, the preamble of Am.Sub.H.B. 14, and the other conflict by implication factors, I conclude that the General Assembly did not explicitly or implicitly indicate that R.C. 955.22 was to exclusively govern dog control. Therefore, LCO 618.125(D) does not violate the conflict by implication test.

**{¶48}** Because LCO 618.125(D) does not violate the contrary directives test or the conflict by implication test, it is a valid enactment pursuant to the Home Rule Amendment.[13] I would, therefore, overrule Stepleton's third and fifth assignments of error and proceed to his remaining assignments of error.

**/jlr**

---

[13] Stepleton did not argue that LCO 618.125(D) violated the "conflict regarding decriminalization" test, so I will not discuss this test herein. *Mendenhall*, 2008-Ohio-270, at ¶ 35.