[Cite as *Duke Energy Ohio, Inc. v. Cincinnati*, 2015-Ohio-4844.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DUKE ENERGY OHIO, INC., | : | APPEAL NO. C-140763 |
| | | TRIAL NO. A-1301131 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| CITY OF CINCINNATI, | : | |
| | | |
| Defendant-Appellant. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 25, 2015

*Strauss Troy Co., LPA, Matthew W. Fellerhoff* and *Emily T. Supinger*, and *Duke Energy Office of the General Counsel* and *James E. McLean, Jr.*, for Plaintiff-Appellee,

*Paula Boggs Muething*, City Solicitor, *Terrance A. Nestor*, Deputy City Solicitor, and *Andrew W. Garth* and *Jessica L. Powell*, Assistant City Solicitors, for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

SYLVIA S. HENDON, Presiding Judge.

{¶1}     This is a utility relocation case.  We are asked to determine who is responsible for the relocation costs incurred by plaintiff-appellee Duke Energy Ohio, Inc., ("Duke") when it was required to relocate its utilities to accommodate defendant-appellant the city of Cincinnati's ("City") streetcar project.  The trial court granted judgment in favor of Duke after determining that the City was responsible for the associated relocation costs.

{¶2}     Because the trial court correctly determined that the City was responsible for the relocation costs, we affirm that court's judgment.

### Facts and Procedure

{¶3}     Planning and development for the streetcar project began in 2007, after the City conducted a streetcar feasibility study.  In October of 2007, the City passed a resolution expressing its desire to move forward with the streetcar project.  Original plans for the streetcar called for it to be privately owned and operated.  But in May of 2010, after the City applied for and received a federal grant, the City deemed the streetcar project a public improvement project and contracted with the Southwest Ohio Regional Transit Authority ("SORTA") to operate the streetcar system.

{¶4}     According to the City's current plan, the streetcar will run on a 3.6-mile loop throughout downtown Cincinnati, from The Banks riverfront development to Over the Rhine, on fixed tracks permanently installed in the roadway.  Installation of these tracks and related infrastructure necessitated that various utility companies,

including Duke, relocate underground utilities that were located in the public right-of-way.

{¶5}    Duke, a provider of gas and electric services to Cincinnati and the surrounding geographic area, has an extensive network of underground utilities. These utilities were originally placed underground in the public right-of-way pursuant to franchise agreements with the City. These franchise agreements were executed in the 1800s and have long since expired.

{¶6}    The City originally took the position that the utility companies were not responsible for their own relocation costs.  But it changed its position when the streetcar project shifted from being privately owned and operated to being owned by the City.  In February of 2011, the City sent letters to all affected utilities informing them that they were required to relocate their underground utilities in the public right-of-way at their own expense.  Duke, however, maintained that the City was responsible for its relocation costs.

{¶7}    Despite its position that the utilities were responsible for their own relocation costs, the City attempted to negotiate cost-sharing agreements with all affected utilities in an effort to prevent construction delay and to manage potential litigation risk.  The City had budgeted approximately 16 million dollars for utility-relocation costs.   It was able to reach agreements with Time Warner Cable, Cincinnati Bell Telephone Company, Level 3 Communications, Duke Energy Generation Services, DTE Energy Services, the Department of Sewers, and Greater Cincinnati Water Works.  But Duke rejected the City's offer to pay approximately six million dollars towards Duke's anticipated 15 million dollar relocation costs.

{¶8} On September 26, 2012, during the course of negotiations with Duke, the City passed Ordinance No. 349-2012. This ordinance enacted Chapter 722 of the Cincinnati Municipal Code, titled "Management and Control of the Use of the City Right-of-Way." Section 722-4 concerned the relocation of facilities in the right-of-way, and it provided that

> Within fifteen (15) days following written notice from the city a provider shall, at its own expense, temporarily or permanently remove, relocate, change or alter the position of any facilities in the right of way whenever the city shall have determined that such removal, relocation, change or alteration is reasonably necessary for any one of the following reasons: (A) the need to construct, repair, maintain, improve or use the right of way or public property; (B) the construction, reconstruction, repair, maintenance or installation of any public improvement in or on the right of way; (C) the public health, safety, and welfare requires it; or (D) for the efficient operations of the city or other governmental entity in or on the right of way.

{¶9} After enacting this right-of-way ordinance, the City sent a letter dated November 1, 2012, to Richard Hicks, Duke's project manager for the utility-relocation work. The letter included the final plans for "the public improvement project." It informed Hicks that the included plans constituted final notice from the City, and that, in accordance with the newly enacted Cincinnati Municipal Code 722-4(c), Duke had to relocate its utilities in the right-of-way at its own expense.

{¶10} On January 30, 2013, the City and Duke entered into a "Cooperation Agreement." This agreement provided that the parties would seek a declaratory judgment in the Hamilton County Court of Common Pleas to determine who was responsible for the cost of relocating Duke's utilities. The agreement specified that the declaratory-judgment action would address the following issue and no other: "To what extent does the City, if at all, bear legal responsibility for the costs of relocation of Duke Energy facilities in connection with the Cincinnati streetcar project?"

{¶11} The agreement further provided that, pending the trial court's adjudication, Duke would perform the relocation work at its own expense. The City was required to place 15 million dollars in an escrow account, and the agreement contained a detailed account of how that money would be disbursed to Duke should the trial court rule in favor of the utility company.

{¶12} On February 14, 2013, Duke filed a complaint for declaratory judgment in the Hamilton County Court of Common Pleas. The complaint stated that Duke was seeking a declaration from the trial court that City Ordinance No. 349-2012 "as it relates to relocation costs for the streetcar project, is invalid and that the City is required to pay the costs associated with the relocation of Duke Energy Ohio's utilities, necessitated by the City's streetcar project." The City filed a counterclaim seeking a declaration from the trial court that "[t]he City bears no legal responsibility for the costs of relocation of [Duke's] facilities in connection with the Cincinnati streetcar project and, accordingly, [Duke] must, at its sole cost, relocate its facilities as required by the City."

{¶13} The parties filed competing motions for summary judgment, along with a joint stipulation of facts. The trial court held that the City had the authority to

construct a streetcar system, and that it had properly enacted Cincinnati Municipal Code Chapter 722 under its home-rule authority. But it determined that the construction of a streetcar system was not a legitimate use of the City's police power, because it did not bear a substantial relation to the public's health, safety, morals, or general welfare. And it concluded that, because construction and operation of the streetcar system was a proprietary function, the City was responsible for the costs of relocating Duke's utilities.

{¶14} The City has appealed. It raises three assignments of error challenging the trial court's declaration that it was responsible for the cost to relocate Duke's utilities.

### Standard of Review

{¶15} Although the parties had filed complaints for declaratory judgment, the trial court adjudicated the controversy by granting summary judgment to Duke. This court has previously questioned the advisability of resolving a declaratory-judgment action by summary judgment. *See Cincinnati v. Harrison*, 1st Dist. Hamilton No. C-130195, 2014-Ohio-2844, ¶ 22. But we have held that, when both parties elected to address the issues raised by cross-motions for summary judgment, demonstrating that both parties believed that there were no genuine issues of material fact, the trial court was free to render judgment as a matter of law. *Id.* Here, the parties submitted a joint stipulation of facts to the trial court, and the trial court's decision fully declared the rights and responsibilities of the parties going forward.

{¶16} We review a trial court's grant of summary judgment de novo. *See Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

Summary judgment is appropriately granted when there exist no genuine issues of material fact, the party moving for summary judgment is entitled to judgment as a matter of law, and the evidence, when viewed in favor of the nonmoving party, permits only one reasonable conclusion that is adverse to that party. *See State ex rel. Howard v. Ferreri*, 70 Ohio St.3d 587, 589, 639 N.E.2d 1189 (1994).

### *Cincinnati Municipal Code 722-4*

{¶17} In its first assignment of error, the City argues that the trial court erred when it failed to declare that the City's relocation order under Cincinnati Municipal Code Chapter 722 was a valid exercise of the City's home-rule authority.

{¶18} The Home Rule Amendment is found in Article XVIII, Section 3, of the Ohio Constitution, and it authorizes municipalities "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." *See In re Complaint of Reynoldsburg*, 134 Ohio St.3d 29, 2012-Ohio-5270, 979 N.E.2d 1229, ¶ 21. The requirement that regulations not be in conflict with general laws pertains only to regulations enacted pursuant to a municipality's local police power, and not a municipality's power of local self-government. *Id.*

{¶19} Ordinance No. 349-2012 enacted Cincinnati Municipal Code Chapter 722 to regulate the use of the City's right-of-way. The City contends that the ordinance was a valid exercise of its home-rule authority, because it involved an exercise of local self-government. But it also argues, in the alternative, that should this court find that enactment of the ordinance did not involve an exercise of local self-government, then the ordinance was a valid exercise of local police power not in conflict with general law. Duke contends that application of the right-of-way

7

ordinance to utility relocation for the streetcar was not a valid exercise of either the power of local self-government or local police power. But it argues, in the alternative, that if the ordinance was a valid exercise of local police power, then it was in conflict with the general law established in R.C. 4939.04.

{¶20} The Ohio Supreme Court has established a three-part test for home-rule analysis. The first step is to determine whether a municipality's ordinance involved an exercise of local self-government or an exercise of local police power. *Id.* at ¶ 24. An ordinance is created under the power of local self-government when it relates "solely to the government and administration of the internal affairs of the municipality." *Beachwood v. Cuyahoga Cty. Bd. of Elections*, 167 Ohio St. 369, 148 N.E.2d 921 (1958), paragraph one of the syllabus. Conversely, an ordinance is enacted under the local police power "if it has a real and substantial relation to the public health, safety, morals or general welfare of the public and is neither unreasonable nor arbitrary." *Downing v. Cook*, 69 Ohio St.2d 149, 150, 431 N.E.2d 995 (1982).

{¶21} The City argues that the preamble to Ordinance No. 349-2012, enacting Cincinnati Municipal Code Chapter 722 and its right-of-way regulations, indicates that the ordinance was a valid exercise of the city's power of local self-government. We are not persuaded. The preamble to the ordinance states that "the City of Cincinnati's management, regulation, and administration of its public right of way with regard to matters of local concern is a valid exercise of the power of local self-government." Despite this assertion, the remainder of the preamble to the right-of-way ordinance indicates that it was enacted in furtherance of the city's local police power. The preamble states that

WHEREAS, Council finds that the City's streets must be managed in order to provide for the public welfare through safe, timely, and efficient transportation of persons and goods and thereby promote the long-term sustainable growth of the city; and WHEREAS, Council desires to promote the management [of] the right of way in a manner that fosters long-term, multi-modal public transportation options in addition to private automobiles * * *; and WHEREAS, modern public transportation improvement projects support the sustainable transportation planning and expansion of the region's public transit network over time and thereby provide reliable and affordable transportation options for persons throughout Greater Cincinnati.

{¶22} These stated goals relate more to the public's health, safety, morals, and general welfare than they relate to the administration of the municipality's internal affairs. We find that, based on the language in the preamble and the terms of the ordinance itself, that Ordinance No. 349-2012 involved an exercise of the city's local police power. *See Reynoldsburg*, 134 Ohio St.3d 29, 2012-Ohio-5270, 979 N.E.2d 1229, at ¶ 37 (holding that a similar ordinance was enacted as an exercise of a municipality's police powers, not as an exercise of local self-government). Having made this determination, we now proceed to the second and third steps of the home-rule analysis to determine whether the city's right-of-way ordinance is in conflict with a general law. *Id.* at ¶ 24.

{¶23} Duke contends that Cincinnati Municipal Code 722-4(c), the section of the ordinance imposing relocation costs upon the utility provider, is in conflict with the general law established in R.C. 4939.04(A)(1). This statute provides that "[a]

municipal corporation shall provide public utilities or cable operators with open, comparable, nondiscriminatory, and competitively neutral access to its public ways." We need not determine whether R.C. 4939.04(A)(1) is a general law, because we find that it is not in conflict with Cincinnati Municipal Code 722-4(c). For purposes of a home-rule analysis, to determine whether a conflict exists between a local ordinance and a general law, we must consider "whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *See Reynoldsburg* at ¶ 50, quoting *Struthers v. Sokol*, 108 Ohio St. 263, 140 N.E. 519 (1923), paragraph two of the syllabus. Cincinnati Municipal Code 722-4(c) deals with determining whether a utility company is responsible for associated costs when utilities in the right-of-way must be relocated. Whereas R.C. 4939.04(A)(1) delineates the manner in which a municipal corporation must proceed when providing access to its public ways. Neither regulation permits what the other forbids, or vice versa.

{¶24} The City's enactment of Cincinnati Municipal Code Chapter 722 was a valid exercise of its local police power under the Home Rule Amendment to the Ohio Constitution. But that determination does not complete our analysis, as the City would suggest. The Home Rule Amendment allows municipalities to adopt regulations in furtherance of the municipality's local police powers. It follows that such regulations cannot be applied outside of the scope authorized by the Home Rule Amendment. When applied, an ordinance, statute, or regulation enacted as an exercise of local police power must bear a real and substantial relation to the public's health, safety, morals, or general welfare. *See Reynoldsburg* at ¶ 25. So, under Cincinnati Municipal Code 722-4(c), the City could only require Duke to relocate its utilities at its own expense to accommodate the streetcar project if such an order

10

furthered the local police power by having a real and substantial relation to the public's health, safety, morals or general welfare. We now consider if it did so.

{¶25} The City's motivations for constructing a streetcar system were clearly conveyed in Resolution No. 59-2007, which was passed to express the City's desire to move forward with the planning of a streetcar system. This resolution provided as follows:

> WHEREAS, a streetcar system within the City of Cincinnati will create much needed jobs, outside investment, increased revenue for all Cincinnati neighborhoods; and
>
> WHEREAS, streetcars have a fixed rail infrastructure, which implies permanence, creating a significant catalyst for redevelopment and an expected 14:1 ratio of economic impact to investment for the community; and * * *
>
> WHEREAS, streetcars can be easily integrated into the built urban environment using relatively low-impact construction techniques; and
>
> WHEREAS, streetcars will take Cincinnati to the next level of growth and help the City to become a City where people chose to live; and
>
> WHEREAS, by connecting people and places, the proposed streetcar system will create a vibrant cityscape and provide a convenient amenity that is attractive to residents * * *.

{¶26} The City argues that the streetcar system is a public improvement project that will supplement existing transportation services, and that it accordingly bears a substantial relation to the public's safety and welfare. But Resolution No. 59-2007 clearly indicates that the City's predominant motivation and purpose for

implementing a streetcar system was the belief that the streetcar would spur economic development in the City. The Resolution makes no mention of providing the benefit of multimodal transportation to the City's residents.

{¶27} Later resolutions and ordinances passed by the City reference the City's expressed purpose of providing additional transportation to its residents. For example, Resolution No. 32-2012, which concerned the appropriation of property for the construction of a streetcar maintenance and operations facility, provided that the streetcar system was "a public transportation improvement project that will supplement existing transit service in downtown Cincinnati, enhance public transit options between the City's two major employment centers, * * * and serve as a key step toward integrating existing and future transportation and transit systems."

{¶28} And Ordinance No. 348-2012, which concerned the issuance of $15,000,000 of public-transportation-improvement bonds for the streetcar system, provided that "the Streetcar System and other regional public transportation improvement projects will enhance the region's transit network by providing reliable, efficient, and sustainable public transportation options for a growing number of persons throughout Greater Cincinnati." This Ordinance further provided that "this Council desires to promote the use of City streets in accordance with a sustainable, multi-modal public transportation network that will promote long-term growth, economic well-being, and livability within the City."

{¶29} These later pieces of legislation were passed well after the City had been embroiled in discussions with Duke, and after the City had drafted its Streetcar Management Plan, which became effective on December 13, 2010. We find Resolution No. 59-2007 to be the best indicator of the purpose of the streetcar

12

system and of the City's related order for Duke to relocate its utilities. And that purpose was to spur economic development, not to protect or promote the public's health, safety, morals and general welfare.

{¶30} Michael Moore, Director of the City's Department of Transportation and Engineering, testified in a deposition that the streetcar was a transportation project that would support the ability of people to circulate in downtown and Over the Rhine. He acknowledged that the streetcar would create a significant economic benefit, but explained that any such benefit was ancillary to the project's purpose of providing transportation benefits. Christopher Eilerman, assistant to the city manager and project manager for the streetcar, likewise testified in a deposition that the main purpose of the streetcar was to move people from various areas of the city to other areas. He testified that the streetcar is designed to have a high level of accessibility for persons with mobility issues, because the streetcar platform is the same height as the floor of the streetcar itself. Eilerman further explained that the streetcar was designed to provide a much quicker ingress and egress for passengers, because it has multiple doors that open at the same time.

{¶31} While the record arguably reveals that construction of a streetcar system could provide some fringe benefit to the public's health, safety, and welfare, it is devoid of evidence that the streetcar system bears a real and substantial relation to the public's health, safety, morals, and general welfare.

{¶32} Because the City's order for Duke to relocate its utilities at its own expense to accommodate the streetcar system was not a valid exercise of the City's local police power, we hold that the trial court did not err in failing to declare that

Cincinnati Municipal Code 722-4(c) imposed the cost of relocating its own utilities upon Duke. The first assignment of error is overruled.

*Common Law*

{¶33} In its second assignment of error, the City argues that the trial court erred by finding that the common-law rule of utility relocation did not apply. It contends that the trial court should have applied the long-standing principle of common law that "when a utility company makes use of the public right of way, the municipality may require the company to relocate its equipment at its own cost when the public welfare so requires." *See Perrysburg v. Toledo Edison Co.*, 171 Ohio App.3d 174, 2007-Ohio-1327, 870 N.E.2d 189, ¶ 16 (6th Dist.).

{¶34} Because we have already determined that the record contains no evidence that the streetcar project bore a substantial relation to the public's general welfare, we hold that the trial court did not err in rejecting this common-law rule. Rather, the trial court correctly applied the rule of law established in *State ex rel. Speeth v. Carney*, 163 Ohio St. 159, 126 N.E.2d 449 (1955). In *Speeth*, the Ohio Supreme Court considered whether utility owners had a right to reimbursement when forced to relocate facilities to accommodate the construction of a governmentally-owned subway system. *Speeth* at 177. The court held that "[i]n the absence of contract to that effect, there is no power in a governmental subdivision to require public utilities in its public streets to relocate facilities at their own expense to accommodate the proprietary public utility operations of such subdivision." *Id.* at paragraph six of the syllabus. The court then reiterated that "the operation of a governmentally owned transit system is a proprietary and not a governmental

14

function." *Id.* at 178, citing *Cleveland Ry. Co. v. North Olmstead*, 130 Ohio St. 144, 198 N.E. 41 (1935).

{¶35} *Speeth* is directly on point and is controlling law on this issue. The City argues that *Speeth* is distinguishable, because it held that the *operation* of a governmentally-owned transit system was a proprietary function, whereas the case at hand involves the *construction* of a governmentally-owned transit system. We find this parsing of words to be misleading.

{¶36} First, the main point of law derived from *Speeth* is, as quoted above, that a governmental subdivision cannot require public utilities to relocate facilities at their own expense to accommodate the *proprietary utility operations* of the subdivision. *Id.* at 177-178. The proprietary utility operations at issue in *Speeth* were the construction, not the operation, of a subway system. The court made clear that, in the utility relocation context, once a governmental subdivision is found to be engaged in a proprietary function, it is to be treated in the same manner as if it were a private utility company seeking relocation of utilities. *Id.* at 178.

{¶37} Second, after reaching this conclusion, the *Speeth* court went on to state that, "[i]n line with this doctrine, this court has held that the operation of a governmentally owned transit system is a proprietary and not a governmental function." *Id.* The *Speeth* court relied on this quoted language to further support its conclusion that the construction of a subway system was a proprietary utility operation. We read *Speeth* to stand for the proposition that both the construction and operation of a governmentally-owned transit system are proprietary functions. This reasoning comports with the precedent established in *Barberton v. Miksch*, 128 Ohio St. 169, 190 N.E. 387 (1934), paragraph two of the syllabus, holding that "[i]n

15

the construction and maintenance of a system for supplying water to its inhabitants, a municipality acts in a proprietary capacity."

{¶38} Applying this law to the case before us, we hold that because Duke was required to relocate its underground utilities to accommodate the construction of the streetcar system, a proprietary utility operation of the City, the City cannot require Duke to bear its own expenses incurred in the relocation. The second assignment of error is overruled.

### Takings Law

{¶39} In its third assignment of error, the City argues that the trial court erred when it based its judgment on takings law. This argument is overruled. The trial court did reference takings law in its opinion, but it clearly based its decision on both the law established in *Speeth* and on whether the City's order for Duke to relocate its utilities at its own expense pursuant to Cincinnati Municipal Code Chapter 722 was a legitimate use of its police powers.

### Conclusion

{¶40} Because the City's order for Duke to relocate its utilities at its own expense to accommodate the streetcar system was not a valid exercise of the City's local police power, Cincinnati Municipal Code 722-4(c) could not serve as a basis for imposing upon Duke the cost to relocate its own utilities. Under the controlling law in *Speeth,* the City was responsible for the costs incurred by Duke to relocate its utilities to accommodate the governmentally-owned streetcar system.

{¶41} The trial court did not err in granting summary judgment to Duke or in granting Duke's motion for declaratory judgment. The judgment of the trial court is affirmed.

Judgment affirmed.

**CUNNINGHAM** and **MOCK, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.